**ONVOY, INC., Appellant,**

v.

**SHAL, LLC, Respondent (C7–02–621), Defendant (C7–02–702),**

**Walter S. Clay, et al., Defendants (C7–02–621), Respondents (C7–02–702),**

**Robert K. Eddy, Respondent (C7–02–702),**

**Darrel Westrum, Respondent (C7–02–702).**

Nos. C7–02–621, C7–02–702.

Supreme Court of Minnesota.

Sept. 25, 2003.

Joseph W. Anthony, Randy G. Gullickson, Janel M. Dressen, Anthony Ostlund & Baer, PA, Minneapolis, MN, for appellant Onvoy, Inc.

Frank A. Taylor, Charles B. Rogers, Janel E. LaBoda, Julie H. Firestone, Briggs and Morgan, PA, Minneapolis, MN, for respondent SHAL, LLC.

Mark J. Briol, Joseph Musilek, Briol & Associates, PLLC, Minneapolis, MN, for respondents Dahl and Clay.

Roger J. Magnuson, Mitchell W. Granberg, Dorsey & Whitney, Minneapolis, MN, for respondent Eddy.

Donald R. McNeil, Coleman, Hull & VanVliet, Minneapolis, MN, for respondent Westrum.

## OPINION

MEYER, Justice.

We are asked to decide whether a corporation may escape an arbitration clause in a contested contract and obtain court jurisdiction by claiming that the contract is void as the result of an interested-director transaction or ultra vires transaction. In addition, the parties dispute whether nonsignatories to the contract may compel arbitration of claims brought by signatories. The court of appeals held that the claims must be arbitrated. We reverse.

Appellant Onvoy, Inc. (Onvoy) is a privately held Minnesota telecommunications company, formerly known as Minnesota Equal Access Network Services, Inc., or MEANS. Sixty-five local telephone service providers founded Onvoy in 1988 to give the providers better access to long

distance service. Respondent SHAL, LLC (SHAL) is a Minnesota company comprised of three local telephone service providers, all of whom are also shareholders of Onvoy. SHAL constructs and maintains fiber-optic telecommunication transport facilities, mostly for the companies who own it. SHAL is also a "segment provider" for Onvoy, meaning it provides one segment of the transmission capacity that Onvoy needs to transfer long distance traffic from local providers to Onvoy.

In 1997 and 1998, Onvoy planned a new fiber network with two routes within Minnesota, one of which extended from Plymouth to Moorhead. Onvoy planned to lease the fiber network if leasing would cost less than constructing, owning, and operating the fiber network itself. Onvoy invited segment providers to submit bids for Onvoy to lease portions of the new network from the providers.

Onvoy's Network Committee developed the "cost benchmark"—the estimated cost of building and owning the Plymouth–Moorhead route—the cost below which segment providers had to bid to receive a leasing contract. In May of 1999, Onvoy requested bids from 50 local telephone service providers. SHAL bid on the Plymouth–Moorhead route. Onvoy's board of directors approved the negotiation of a contract with SHAL and executed a ten-year lease with SHAL on October 25, 1999. The lease is signed by the president of SHAL on one side, and the president of Network Technologies, a working group within Onvoy, on the other side. The lease contained a clause mandating arbitration under the rules of the American Arbitration Association and elected Minnesota law under a choice-of-law provision.

The individually-named defendants, respondents here, all had close affiliations with both SHAL and Onvoy during the negotiation of the lease in question. Walter Clay was a member of both corporations' boards of directors, and also served on Onvoy's Finance and Audit Committee. Robert Eddy was a member of both corporations' boards of directors, and additionally served on Onvoy's Network Committee. Darrel Westrum was an employee of SHAL, and served on Onvoy's Network Committee. Tom Dahl is the general manager of one of the three telephone service providers in SHAL, and served on Onvoy's Network Committee.

At the same time that Onvoy was receiving bids on its new fiber optic routes, it was also seeking investors in this new venture. In September of 1999, two investment companies of George Soros combined to purchase 50,000 shares of convertible preferred stock in Onvoy for $50,000,000. As part of that deal, Onvoy shareholders amended Onvoy's articles of incorporation on September 1, 1999, giving the Soros shareholders the right to elect three members of Onvoy's board of directors and requiring that at least one of the Soros directors approve certain types of corporate actions, including contracting with affiliates and entering into or amending any material contract.

Neither Onvoy nor SHAL offers much information about what transpired between the execution of the lease in October of 1999 and Onvoy's filing of the complaint in this action in August of 2001.[1] SHAL notes that during that time Onvoy used the fiber optic network and paid SHAL in accordance with the lease. In May of 2001, Onvoy convened an independent committee to look into the lease's terms

---

1. The facts in this case are under-developed because it comes to us on appeal from a Rule 12 motion to dismiss on the pleadings.

and circumstances and subsequently filed its complaint in Hennepin County District Court seeking reformation of the lease, among other relief. Onvoy then amended its complaint in November of 2001 and sought rescission.

In its amended complaint, Onvoy alleged that the SHAL lease is several times more expensive than the market price. Onvoy asked for a declaratory judgment that the lease is unlawful and subject to rescission, injunctive relief, damages in excess of $50,000, and attorney fees incurred. Against SHAL, Onvoy first alleged the lease between SHAL and ONVOY is an interested-director transaction, prohibited by Minn.Stat. § 302A.255 (2002). Second, Onvoy alleged that the lease is an ultra vires transaction (one without authority), because the board of directors did not approve it under the amended articles of incorporation, which required a vote by at least one of the Soros directors. Onvoy also alleged SHAL has been unjustly enriched, and conspired with the individual defendants to commit tortious conduct. In multiple counts against the individual defendants, Onvoy alleged that defendants Clay, Eddy, Westrum, and Dahl breached fiduciary duties and/or duties of loyalty to Onvoy, made material misrepresentations that induced Onvoy to enter into the lease, and negligently misrepresented the terms of the lease and bidding process.

The district court denied motions by SHAL and the individual defendants to dismiss plaintiff's complaint and compel arbitration. The district court concluded that Onvoy was not compelled to arbitrate the dispute under Minnesota law, citing *Atcas v. Credit Clearing Corp.*, 292 Minn. 334, 197 N.W.2d 448 (1972), because the arbitration clause did not encompass the claims and arbitration is not appropriate when one party seeks to rescind the contract. The district court also concluded

that federal arbitration law does not preempt Minnesota law. The district court did not discuss whether the individual defendants could compel arbitration.

The court of appeals reversed. After concluding that federal arbitration law did not preempt Minnesota law, because "Minnesota arbitration law favors arbitration on these facts," the court of appeals applied Minnesota contract law. The court decided that Onvoy must arbitrate its claims because its complaint sought monetary damages and not mere rescission of the contract. The court did not address whether individual defendants could compel arbitration. We granted Onvoy's petition for further review.

I.

This court has de novo review when reviewing arbitration clauses. *See Johnson v. Piper Jaffray, Inc.*, 530 N.W.2d 790, 795 (Minn.1995). Whether Onvoy may be compelled to arbitrate its claims depends in large measure on the language of the arbitration clause and other lease terms between SHAL and Onvoy. In analyzing arbitration clauses, courts should "enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt Info. Sciences, Inc. v. Leland Stanford Jr. Univ.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *see also Johnson*, 530 N.W.2d at 795. The party opposing arbitration bears the burden of proving that the dispute is outside the scope of the agreement. In addition the party bears an especially high burden if that party drafted the arbitration agreement. *See Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 91–92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000); Gabriel M. Wilner, *Domke on Commercial Arbitration* § 12.04 at 14 (1983).

The arbitration clause in the lease between SHAL and Onvoy reads:

> *Mediation and Arbitration.* Any unresolved disputes *arising under* this Lease shall be first submitted to mediation. Unless the dispute is resolved after consultation between the liaisons of each party, a mediator shall be selected by agreement of the chief operation officers of each party. In the event that a dispute cannot be resolved by mediation, then the parties agree that the dispute shall be submitted to arbitration under the rules of the American Arbitration Association.

(Emphasis added.) Onvoy urges us to apply the Minnesota Arbitration Act and our case law interpreting that act to determine that the "arising under" language does not evince an intent to arbitrate claims relating to the making of the contract. SHAL argues that the parties intended to arbitrate claims about the making of the contract, relying in part on an argument that "arising under" is broad enough to encompass Onvoy's claims.

Reviewing the district court's analysis of this case highlights the status of Minnesota law on arbitration. The district court first considered the Minnesota Arbitration Act. Minnesota Statutes § 572.08 (2002), declares that "a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." In 1972, we interpreted this act to determine whether a plaintiff could escape an arbitration clause in his franchise agreement by claiming there was fraud in the inducement of the contract. *Atcas,* 292 Minn. at 336, 197 N.W.2d at 450. In holding that the parties had not intended to arbitrate the issue of fraud in the inducement, and therefore that the dispute

should remain in court, we stated that "[w]hen the making of the agreement itself is put in issue, as is the result of a claim of fraud in the inducement, that issue is more properly determined by those trained in the law." *Id.* at 350, 197 N.W.2d at 457.

The district court used the legal framework we set out in *Atcas* to conclude that Onvoy's claims regarding the formation of the lease would not be compelled into arbitration. *Atcas* instructed courts to commence an analysis of a motion to compel arbitration by looking at the language of the arbitration clause at issue to see if it is broad enough to cover the plaintiff's claims; if so, courts should verify that the plaintiff seeks total rescission of the contract. *See Atcas,* 292 Minn. at 347–48, 197 N.W.2d at 456. The district court determined that the language of the arbitration clause did not evince the parties' intent to arbitrate Onvoy's claims regarding the making of the contract and that Onvoy properly sought complete rescission of the contract. The court therefore concluded that, under *Atcas,* Onvoy's "claims are not subject to compelled arbitration under Minnesota law."

The district court then considered the impact of federal arbitration case law on its decision. The court concluded that "because the Supreme Court of Minnesota has held that the Minnesota Arbitration Act [is] not preempted by the FAA and that the Minnesota Arbitration Act therefore applies to cases brought in state courts involving arbitration agreements, [Onvoy] cannot be compelled to arbitrate the matter under the FAA" (relying on our decision in *Thayer v. American Fin. Advisers, Inc.,* 322 N.W.2d 599 (Minn.1982)). In *Thayer,* we acknowledged that federal law diverged from our holding in *Atcas,* especially on the issue of the severability of arbitration clauses,[2] and determined that

---

**2.** Discussed in more depth *infra* at 352–53.

*Atcas* was not preempted by federal case law. *Thayer,* 322 N.W.2d at 603.[3]

■ While the district court's analysis is a correct application of Minnesota law under *Atcas* and *Thayer,* that reasoning now conflicts with and is preempted by federal law. Since our decision in *Thayer,* the Supreme Court has decided that Congress intended to use its full commerce power in drafting the FAA, so that it applies to all transactions that involve or affect interstate commerce. *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 271–72, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). The Court explained further that the FAA applies to transactions that *in fact* involve interstate commerce, whether or not the parties anticipated an interstate impact. *Id.* at 273–74.[4] It is now clear that Minnesota courts must apply the FAA to transactions that affect interstate commerce.

■ Because respondents do not dispute that the fiber-optic transmission lease involves interstate commerce within the meaning of *Terminix,* the arbitration clause in the lease between SHAL and Onvoy must be analyzed under federal law and, therefore, the district court and court of appeals erred in analyzing this case under *Atcas.* We overrule *Atcas* to the extent it conflicts with the holding in *Allied–Bruce Terminix v. Dobson,* 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). The instant case must be analyzed under the Federal Arbitration Act and the federal cases interpreting that act. The FAA voices a strong presumption in favor of arbitration. *See Volt,* 489 U.S. at 476, 109 S.Ct. 1248. It declares that written arbitration clauses are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1999). Any doubt with respect to the intent of the parties regarding the scope of arbitration should be resolved in favor of arbitration. *Volt,* 489 U.S. at 476, 109 S.Ct. 1248.

■ The question is whether, under federal law, agreeing to arbitrate claims "arising under" the contract encompasses claims that the lease is void as an interested-director transaction or as an ultra vires transaction. The Supreme Court held that similar language in an arbitration clause, "any controversy or claim [that] shall arise out of this agreement, was broad enough to compel arbitration of the plaintiffs claims of fraudulent representations." *See Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 508, 519–20, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). The Third Circuit recently reviewed federal case law interpreting arbitration clauses containing the term "arising under" or substantially similar terms and concluded that the majority of circuits have interpreted those terms to include claims regarding contract formation. *Battaglia v. McKendry,* 233 F.3d 720, 725–27 (3d Cir.2000) (noting that "when phrases such as 'arising under' * * * appear in arbitration provisions, they are normally given broad construction, and are generally construed to encompass claims going to

3. We looked at the scope of the Federal Arbitration Act (FAA) in *Thayer,* and we determined that "Congress did not intend to 'occupy the field' of arbitration agreements contained in contracts involving interstate commerce." *Thayer,* 322 N.W.2d at 604. We reached that conclusion because the Supreme Court had not ruled on how broadly to interpret the FAA's language of "involving commerce." *Thayer,* 322 N.W.2d at 603–04.

4. The Supreme Court has also clarified that the substantive federal law of arbitration applies in state courts and preempts state statutes that invalidate arbitration agreements, or undermine the goals and policies of the FAA. *Allied–Bruce Terminix Co. v. Dobson,* 513 U.S. 265, 272, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *Volt Info. Sciences, Inc.,* 489 U.S. at 477–78, 109 S.Ct. 1248.

the formation of the underlying agreements"). *See generally Domke* § 12.05 at 14 (noting that an agreement to arbitrate "[a]ny claim or controversy arising out of or relating to th[e] agreement" is the paradigmatic broad arbitration clause). Applying the reasoning set forth in these cases, we conclude that the language "arising under" in the arbitration clause at issue appears broad enough to encompass some issues regarding contract formation.[5]

In concluding that the arbitration clause in question is broad and prescribes arbitration of most claims, we do not mean to indicate that we will find all future arbitration clauses broad enough to encompass all claims.[6] We limit our determination to the facts of this case and the particular arbitration clause at issue. Parties who want the courts to retain jurisdiction over matters of contract formation, or any other particular issues they foresee may arise in the business relationship, must expressly state such an intent when drafting the arbitration clause in the contract. Presented with a clear statement of the parties' intent, courts will honor the plain language of the document and either retain

jurisdiction of the case or compel arbitration. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (noting that the "[FAA] does not require parties to arbitrate when they have not agreed to do so"); *Peggy Rose Revocable Trust v. Eppich*, 640 N.W.2d 601, 606 (Minn.2002) (clarifying that "parties may agree to arbitrate any type of dispute"); *see generally Domke* § 12.05 at 13 ("Parties may agree to submit to arbitration nearly any controversy that could be normally dealt with in ordinary court proceedings.").

Onvoy urges us to rely on the decisions of certain federal circuit courts of appeals that have held that some claims about the very existence of the contract must be heard by a court, despite the scope of the arbitration agreement. SHAL argues that a Supreme Court case, *Prima Paint v. Flood & Conklin*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), is dispositive and mandates that Onvoy arbitrate its claims.

In *Prima Paint* the Supreme Court declared that in order for a plaintiff to es-

---

**5.** Onvoy argues that the inclusion of a provision choosing Minnesota law to govern the document shows an intent of the parties to be governed by *Atcas* and its progeny instead of the FAA. We disagree. Courts do not interpret contract language to preclude application of the FAA unless the parties' intent is "abundantly clear." *UHC Mgmt. Co. v. Computer Scis. Corp.*, 148 F.3d 992, 997 (8th Cir. 1998); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 64, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (holding that a choice-of-law provision opting for New York law was not sufficient to annul an arbitrator's award that was prohibited under New York law).

**6.** Critics of the broad federal policy favoring arbitration contend that mandatory arbitration clauses in consumer contracts are depriving people of their right to be heard in court. *See, e.g.,* Sen. Russell D. Feingold, *Mandatory Arbitration: What Process is Due?*, 39 Harv. J.

on Legis. 281, 283–84 (2002) ("[i]nstead of providing disputants with options for dispute resolution, the courts * * * are converting arbitration into a tool for the powerful to exert authority over the less powerful"). We are sympathetic to this criticism. While arbitration retains many benefits, and we continue to support a policy favoring arbitration, the arbitration system may not have all the comparative advantages over the court system that were originally envisioned by arbitration's promoters. *See Developments—The Paths of Civil Litigation*, 113 Harv. L.Rev. 1752, 1852–55 (2000). The rule we adopt today, allowing courts to retain jurisdiction over credible claims that a contract is void, leaves room for consumers to escape obvious abuses of power in contracting. *See, e.g.,* Minn.Stat. § 336.2-302 (2002) (allowing courts to refuse to enforce an unconscionable contract).

cape arbitration of his or her claim, the plaintiff must allege a problem with the making of the arbitration clause itself, not the contract as a whole. *Id.* at 403, 87 S.Ct. 1801. The Court reached that result because arbitration clauses are severable from the remainder of the contract under the FAA.[7] *Prima Paint,* 388 U.S. at 403–04, 87 S.Ct. 1801. In *Prima Paint,* the Supreme Court compelled arbitration notwithstanding the plaintiff's allegation that there was fraud in the inducement of the contract. *Id.* The Court held that the plaintiff could not escape compelled arbitration unless it showed that the arbitration clause itself was induced by fraud. *Id.* In cases where plaintiffs do not direct claims of fraud to the arbitration clause itself, a broad arbitration clause will be enforced and the parties will be forced to arbitrate their claims under the FAA. *Id.* SHAL argues that *Prima Paint* is dispositive of Onvoy's case and mandates that Onvoy arbitrate its claims. Onvoy responds that *Prima Paint* did not address the facts of the instant case, where the existence of the agreement itself is at issue, and therefore the severability doctrine does not apply.

Because Onvoy has not alleged any problem particular to the making of the arbitration clause in this case, a simple application of *Prima Paint* would send Onvoy to arbitration.[8] However, some federal circuit courts have carved out an exception to the *Prima Paint* rule that allows a court to hear challenges that are not directed at the arbitration clause itself. This exception allows a court to hear a plaintiff's claim that the disputed contract is *void,* while claims that a contract is *voidable* must be arbitrated.[9] *See, e.g., Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.,* 263 F.3d 26, 32 (2d Cir.2001); *Sandvik AB v. Advent Int'l Corp.,* 220 F.3d 99, 106–08 (3d Cir.2000); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,* 925 F.2d 1136, 1140–41 (9th Cir.1991). These federal courts reason that parties should not be forced to arbitrate under an agreement that they allege never existed.

■ SHAL argues that neither the Supreme Court nor the Eighth Circuit has adopted the distinction between void and voidable contracts and, therefore, neither should this court. However, no circuit has explicitly disavowed the distinction and all federal circuits seem to have at least ac-

---

7. In contrast, we had previously held that under the Minnesota Arbitration Act arbitration clauses are not severable from the contract, such that a flaw in the formation of the contract also taints and terminates the arbitration clause. *Atcas,* 197 N.W.2d at 456 (reasoning that "if fraud vitiating the primary subject matter of the contract is proved, it would also vitiate the arbitration clause"). Although we overrule *Atcas* to the extent it conflicts with governing federal precedents, it may still govern the rare agreements that do not involve interstate commerce.

8. Although it did not make the claim in its complaint, Onvoy included an argument in a footnote to its brief that its allegations *are* directed at the arbitration clause. However, the claims it raises are in no way different from those it raises about the entire contract.

This new claim is also waived as it was not alleged in the complaint or in either court below. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988).

9. Black's defines void as "of no legal effect; null" and voidable as "valid until annulled; esp., (of a contract) capable of being affirmed or rejected at the option of one of the parties." Black's Law Dictionary (7th ed.) We have had occasion to comment on the distinction between contracts that are void and those that are voidable. *See, e.g., Dvorak v. Maring,* 285 N.W.2d 675, 677 (Minn.1979) (noting that a conveyance of homestead property without the signature of both spouses is void, not merely voidable); *Spartz v. Rimnac,* 296 Minn. 390, 393–94, 208 N.W.2d 764, 767 (1973) (reciting treatise descriptions of voidable contracts).

cepted a similar rule that courts have jurisdiction when one party denies the very existence of the contract. *See, e.g., Chastain v. Robinson–Humphrey Co.,* 957 F.2d 851 (11th Cir.1992); *I.S. Joseph Co. v. Michigan Sugar Co.,* 803 F.2d 396, 400 (8th Cir.1986). We find the distinction made by the Second Circuit in *Sandvik* persuasive and adopt the exception to the *Prima Paint* doctrine enunciated therein; parties may not be compelled to arbitrate claims if they have alleged that the contract at issue never legally existed. Therefore, allegations that a contract is void may be heard by a court, even if not specifically directed to the arbitration clause, while allegations that a contract is voidable must be sent to arbitration.

## II.

■ Applying this rule of law, we must consider whether Onvoy's claims about the formation of the lease render the lease void, as opposed to rendering it merely voidable. Onvoy makes two claims as to how the lease is void under Minnesota law—it claims the lease was an illicit ultra vires transaction and that it was an illicit interested-director transaction. In determining whether a valid agreement to arbitrate exists, courts look to applicable state law, as long as the state law invoked applies to contracts generally and is not aimed at arbitration clauses specifically. *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 685, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *Shaw Group, Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 120 (2d Cir.2003).

### A. Ultra Vires Acts

■ We consider whether Onvoy's ultra vires claim, if successful, would render the lease void or voidable. Onvoy asserts that the lease is ultra vires because it was not approved by a majority of the Onvoy board of directors and one Soros director as required by the amended articles of incorporation. Because the lease was entered into without authority, Onvoy claims that its lease with SHAL is void. SHAL posits that any such defect would not void the lease, and the arbitration clause would still be valid. The district court found that Onvoy had set forth a legally sufficient claim for relief under Minn.Stat. § 302A.165, and therefore denied SHAL's motion to dismiss the claim. The court of appeals did not reach this issue.

Minnesota Statutes § 302A.165 governs ultra vires acts. The statute presumes contracts are valid; an otherwise lawful contract "is not invalid because the corporation was without the power to * * * perform the contract." Minn.Stat. § 302A.165. However, the statute delineates three situations in which a contract or transaction can be declared invalid by a court because it was entered into without authority.[10] Most applicable for this case is part (b) of the statute, which allows a corporation to bring an action "against the incumbent or former officers or directors of the corporation for exceeding or otherwise violating their authority" in a state court and have the contract declared invalid.

*Bell v. Kirkland,* 102 Minn. 213, 218, 113 N.W. 271, 273 (1907), set out two types of ultra vires contracts. The first type, a more serious violation, describes "a contract which is not within the scope of the powers of a corporation to make under any circumstances, or for any purposes." *Id.* The second type refers to contracts within the corporation's power, but with "some irregularity or defect in the actual exercise

---

10. Minnesota's statute keeps with the trend among states to abolish or limit the ultra vires doctrine. *See* 7A William Meade Fletcher, et al., *Fletcher Cyclopedia of the Law of Private Corporations* §§ 3407, 3439 (Perm.Ed., rev. vol.1999).

of the power." *Id.* at 219, 113 N.W. at 273. Acts that are ultra vires of the first type are void, while those of the second type are not automatically void. *Id.* at 219, 113 N.W. at 274. A similar distinction is put forward in Fletcher's treatise, describing true ultra vires contracts as those outside the express or implied powers of the corporation fixed in its charter, statutes, or common law, and distinguishing acts that have been performed in the interest of the corporation but "beyond the authority of management." 7A Fletcher Cyc. Corporations §§ 3399, 3402.

■■■ The facts of the present case approximate the second type of ultra vires act described in *Bell* more closely than the first, suggesting that Onvoy's ultra vires claim would not render the lease void under Minn.Stat. § 302A.165. Onvoy had authority to enter into leases of this type and regularly did so; Onvoy alleges simply a "defect" in the exercise of its corporate power in failing to approve the lease by a majority of the Onvoy board of directors and one Soros director. Because it was not outside the authority of the corporation to enter into the lease and Minn.Stat. § 302A.165 presumes contracts are valid, we conclude that Onvoy's claim that the lease is ultra vires, even if proven, would not be sufficient to declare the lease void, and therefore must be arbitrated.[11]

## B. Interested–Director Transaction

Onvoy also asserts the lease is void and not subject to arbitration because the individually-named defendants negotiated the lease on behalf of Onvoy while either being board members or employees of SHAL. Onvoy alleges that Onvoy's Network Committee made multiple decisions that unnecessarily ratcheted up the cost benchmark, making it more likely that SHAL could win the bid. Onvoy claims that this amounts to self-dealing, which is void under Minnesota law as an "interested director" contract. SHAL maintains that a transaction involving interested directors makes a lease at most voidable. The district court, in analyzing SHAL's motion to dismiss, found that Onvoy had "adequately [pled] a claim for rescission based upon an interested director transaction." The court of appeals did not reach this issue.

A claim that interested directors sullied a transaction is governed by statute in Minnesota. Minnesota Statutes § 302A.255 (2002) presumes a transaction is "not void or voidable," even if approved by directors, officers, or legal representatives with a "material financial interest" as long as the party asserting the validity of the transaction can satisfy one of four safe harbor provisions. The defendant (in this case SHAL and the individually-named defendants) has the burden of proving the validity of the transaction. *See* 18 John H. Matheson & Philip S. Garon, Minnesota Practice, *Corporation Law and Practice* § 3.32 at 93 (1996). The defendant must show either (1) that the transaction was fair and reasonable to the corporation at the time it was approved; (2) that material facts about the contract and the directors' interest were fully disclosed and the contract was approved in good faith by at least two-thirds of the disinterested corporate shareholders; (3) that material facts about the contract and the directors' conflicts were known by a board or committee who authorized the transaction without the vote of interested directors; or (4) that the

---

**11.** "Where a case presents both arbitrable and nonarbitrable issues, the issues subject to arbitration should be tried before an arbitrator, leaving the court to determine the nonarbitrable matters." *Domke, supra,* § 12.05 at

**14.** *See also Tai Ping Ins. Co. v. M/V Warschau,* 731 F.2d 1141, 1146 (5th Cir.1984) (holding that neither "duplication of effort" nor the "intertwining doctrine" was enough to keep an arbitrable issue in court).

contract is a distribution, merger, or exchange. *See* Minn.Stat. § 302A.255. Onvoy alleges in its complaint that none of the statute's safe harbor provisions apply to the facts of this case.

Minnesota Statutes § 302A.255 leaves open the possibility that a transaction may be void as a result of the participation of an interested director. Because Onvoy alleges that interested directors improperly negotiated the lease, the burden shifts to SHAL and the individually-named defendants to establish the existence of one of the safe harbors. At this stage in the proceedings, SHAL and the individually-named defendants have not had the opportunity to develop a record on this issue and, therefore, it is not ripe for decision. Therefore, we remand to the district court to determine whether this lease is the product of an interested-director transaction sufficient to void the lease under Minn.Stat. § 302A.255. If the district court determines the lease is void under our corporate law statute, Onvoy's interested-director claim may be heard by the district court instead of an arbitrator. If the district court determines the lease is only voidable, Onvoy's claims must be compelled to arbitration pursuant to the *Prima Paint* ruling. *See Sphere Drake*, 263 F.3d at 32.

### III.

The final issue we must decide is whether the four individual defendants are entitled to enforce the arbitration provision of the lease between Onvoy and SHAL. Generally, arbitration clauses are contractual and cannot be enforced by persons who are not parties to the contract. *Domke, supra*, § 10.00. There are excep-

tions to the rule, however. Federal cases have set out at least three principles on which a nonsignatory to a contract can compel arbitration: equitable estoppel, agency, and third-party beneficiary. *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999).[12] Equitable estoppel prevents a signatory from relying on the underlying contract to make his or her claim against the nonsignatory. *See id.; Domke, supra*, § 10.07. Principles of agency work to "prevent circumvention of arbitration agreements but also to effectuate the intent of the signatory parties to protect individuals acting on behalf of the principal in furtherance of the agreement." *Domke, supra*, § 10.02. Finally, nonsignatories who are third-party beneficiaries may enforce an arbitration clause if the "contracting parties intended the third party to directly benefit from the contract." *Domke, supra*, § 10.08. The individual defendants claim Onvoy is equitably estopped from seeking court jurisdiction and that the defendants are agents of SHAL.

We note that the individual defendants appear to be employees or agents of SHAL, with the exception of Tom Dahl, whose status is unclear from the record. For those defendants who are agents of SHAL, their ability to compel arbitration of their claims is linked to SHAL's ability to compel arbitration—if SHAL can compel arbitration of Onvoy's claims against it, the individuals can also compel arbitration of Onvoy's claims against them as agents of SHAL, because to do otherwise would be to subvert the intent of the signatories. *See MS Dealer*, 177 F.3d at 947; *see also Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1122 (3d Cir.

12. Minnesota courts have not previously had occasion to address this precise question. *See Prestressed Concrete, Inc. v. Adolfson & Peterson, Inc.*, 308 Minn. 20, 22–23, 240 N.W.2d 551, 552–53 (1976) (deciding that two parties in a multiparty suit, who were not agents but separate corporations, could not be compelled to arbitrate their claims).

1993); *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir.1990); *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1187–88 (9th Cir.1986). Because we have remanded to the district court for further inquiry into SHAL's ability to compel arbitration, we must also remand the issue of the individual signatories. However, it is worth clarifying that the agency theory cannot extend to claims that the individuals breached their duties to Onvoy; it only applies to their actions as agents of SHAL, the principal. If the district court determines SHAL can compel arbitration, and some of the individual defendants are not agents of SHAL, the district court shall also rule on the ability of those individuals to rely on equitable estoppel to compel arbitration. If the individual defendants are neither agents of SHAL nor entitled to use the principle of equitable estoppel to compel arbitration of a particular claim, that claim must remain in district court.

We reverse and remand to the district court for further proceedings in accordance with this opinion.

HANSON, J., took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (concurring).

I concur with the result reached by the majority, but write separately to highlight my concerns regarding the potential for abuse of power when parties with unequal bargaining power contract to arbitrate their disputes. I am concerned that too broad a construction of arbitration clause language when applied to issues such as the formation of the arbitration clause may deprive some individuals of their right to a trial by jury as guaranteed by the Seventh Amendment to the United States Constitution and Article I, Section 4 of the Minnesota Constitution.

The majority correctly points out that the law favors arbitration. Individuals have the right to contract, which includes the right to agree to arbitrate their disputes. When two parties freely agree to arbitration and that agreement is made clear by the language of an arbitration clause, the parties are subject to the terms of that agreement and they have waived their right to have their dispute decided by a jury. We have been clear that an agreement to arbitrate waives a right to trial by jury because " 'loss of the right to jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate.' " *Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 653 (Minn.1990) (quoting *Pierson v. Dean, Witter, Reynolds, Inc.*, 742 F.2d 334, 339 (7th Cir.1984)). Moreover, I acknowledge that we have made it clear that arbitration is not only favored as a method of resolving disputes, but that arbitration clauses should be construed to favor arbitration. We have said:

> In evaluating whether the parties agreed to arbitrate [a] * * * dispute, we remain aware that we should resolve any doubts concerning the scope of arbitrable issues in favor of arbitration, "whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

*Johnson v. Piper Jaffray, Inc.*, 530 N.W.2d 790, 795 (Minn.1995) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

When we construe arbitration clauses to encompass issues of contract formation, we need to be mindful of the potential for individuals to unknowingly and involuntarily waive their constitutional right to a trial by jury. Article I, Section 4 of the Minnesota Constitution provides in part that "[t]he right of trial by jury shall remain

inviolate, and shall extend to all cases at law without regard to the amount in controversy." Constitutional rights are generally waived only when the waiver is "knowing, voluntary, and intelligent." *See State v. Camacho*, 561 N.W.2d 160, 168 (Minn.1997) (applying this standard to the waiver of *Miranda* rights). The intent to waive a jury trial must be "expressed affirmatively" or "appear by necessary inference from unequivocal acts or conduct." *Aufderhar*, 452 N.W.2d at 653.

While the issue of waiver of the right to a jury trial is not directly before us in this case, I believe it is important to caution courts to be mindful of the right of trial by jury when an arbitration clause is agreed to as part of a contract that might be characterized as a contract of adhesion. Contracts of adhesion can result when the terms of a contract are dictated by one contracting party to the other party in a "take it or leave it" fashion because of unequal bargaining power. *See Minn. Min. & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 185 (Minn.1990) (Kelley, J., dissenting). The Montana Supreme Court recently discussed the issue of waiver of jury trial rights in connection with an arbitration clause in a contract it found to be a contract of adhesion. In a special concurrence signed onto by a majority of that court, Justice Nelson stated the problem thusly:

> Given the sacredness and inviolability of the fundamental right to trial by jury, any contract provision that openly or subtly causes the forfeiture of the exercise of this right must be rigorously examined by the courts. This is all the more necessary when such a contract provision is included in a standard-form contract of adhesion foisted upon unsophisticated and unsuspecting ordinary citizens and small business people as part of the intercourse of daily life. Indeed, the use of such contractual provisions is at one and the same time an "open attack" on the right of jury trial and a "secret machination" causing forfeiture of that right that Blackstone predicted would "sap and undermine" the right, and with that our "public and private libert[ies]."

*Kloss v. Jones & Co.*, 310 Mont. 123, 54 P.3d 1, 12–13 (2002) (Nelson, J., concurring specially) (quoting William Blackstone, *Commentaries on the Laws of England* (1765), *reprinted in* Volume 2 of *In Defense of Trial by Jury* at ii (J. Kendall Few, American Jury Trial Foundation, 1993)).

The United States Supreme Court has held that the Federal Arbitration Act (FAA) preempts state laws that are hostile to arbitration, *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), but it is unclear how far federal preemption extends to state law. A certain tension exists in this area of the law and this tension continues with today's opinion. Both the federal courts and our court have developed a body of law that suggests any doubts concerning the scope of arbitrable issues be resolved in favor of arbitration, including issues of contract formation. *Johnson*, 530 N.W.2d at 795. This body of law by its nature indicates that we should favor a construction which waives the right of trial by jury. Nevertheless, our courts must carefully scrutinize a waiver of the right of trial by jury to ascertain that it was done knowingly, voluntarily, and intelligently. It is not my intent in this concurrence to provide an analysis of the conflicting policies that cause this tension. Such an analysis can wait for that day when this issue is squarely before us. Rather, my intent is to sound a note of caution to courts that when a right as fundamental as the right of access to the courts and trial by jury is at stake, waiver of that right is not to be

lightly presumed. *See Kloss,* 54 P.3d at 15 (Nelson, J., concurring specially).

GILBERT, Justice (concurring in part, dissenting in part).

In a 1968 United States Supreme Court case, Justice Black prophetically noted:

> It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review.

*Commonwealth Coatings Corp. v. Continental Cas. Co.,* 393 U.S. 145, 148–49, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968).

I generally concur with the result reached by the majority and believe that alternative dispute resolution ("ADR") plays an important role in our system of justice. However, the Federal Arbitration Act as implemented has some significant shortcomings. Most poignantly, it lends too much power to an arbitration system that does not properly account for impartiality and a lack of legal oversight. We must therefore be vigilant to preserve and improve Minnesota's ADR system where possible and should not be so eager to defer to the federal system unless clearly required under federal law. I also respectfully dissent from the majority's discussion and remand decision relating to the individual defendants.

Private adjudication is an alternative to the two primary dispute resolution forums that were established in our constitutions: courts and juries. *See* U.S. Const. art. III, § 1, amends. VI, VII; Minn. Const. art. I, § 4, art. II, § 1. Any substitute for these constitutional forums must be held to the highest standards of quality. Consequently, both the federal and the Minnesota ADR system should be thoroughly evaluated so that they may carry the same integrity that we require from our courts. This evaluation is especially important in current times, as record amounts of arbitration and mediations are occurring daily.

Minnesota's system of ADR originated prior to statehood. The underpinnings of ADR in Minnesota have been with us since the territorial laws of the State of Minnesota were established in 1851. *See* Rev. Stat. (Territory) ch. 96, § 1. When the first legislature of the State of Minnesota convened, arbitration provisions from territorial days were incorporated in our statutes. *See* Minn.Stat. ch. 89 (1860). The statute preserved a common law right of arbitration. The first arbitration case in the Minnesota Supreme Court not only upheld an arbitration agreement, but also generally encouraged the settlement of differences by arbitration. *See Washburne v. Lufkin,* 4 Minn. 466, 471–72 (1860).

In recent times, the importance of ADR has grown and has not only continually been favored by both Congress and the Minnesota legislature for a number of years, but the Minnesota courts also adopted rules of practice to institutionalize ADR within the judiciary. *See, e.g.,* Minn. Stat. § 65B.525, R. 10 (Qualification of Arbitrator); Minn. Gen. R. Prac. 114. Along with this development, Minnesota has adopted professional and ethical rules and standards by which arbitrators and mediators must conduct their affairs on behalf of our citizens. The Alternative Dispute Resolution Board has jurisdiction over discipline matters and complaints relating to actions of approved neutrals.

However, as pointed out in a recent law review article, arbitrators and mediators

are relatively autonomous and unaccountable. *See* Adam Furlan Gislason, *Demystifying ADR Neutral Regulation in Minnesota: The Need for Uniformity and Public Trust in the Twenty-First Century ADR System*, 83 Minn. L.Rev. 1839, 1854 (1999). Furthermore, although 28 U.S.C. § 656 (2003) calls for a certification of arbitrators and the establishment of standards for federal court-appointed arbitrators, there appears to be a lack of standards or rules for a large portion of the ongoing extra-judicial arbitration. Extra-judicial arbitrations are now dominant in interstate commerce, but have largely been left to the devices of various industry groups to establish rules of qualification and selection. Several inherent problems therefore exist with the current system of ADR.[1]

First, the ability of arbitrators and mediators to be impartial is suspect. Many arbitrators and mediators have ties to the industries from which they derive cases. Large numbers of professional arbitrators have been recruited, trained, enlisted and rehired as arbitrators in industry or securities related groups whose cases they are now deciding. Many retail customer agreements contain standard arbitration clauses. Most arbitration associations also publish the amounts of the past awards of their "approved arbitrators." Any large arbitration award will be documented and noted by industry groups who decide whether they are going to rehire an arbitrator. Arbitrators who have made significant awards could easily be excluded from any new arbitration on behalf of their large retail establishment solely because of a prior significant award. These removal decisions often have no legal underpinnings and are not based on the facts or the merits of the case or the professionalism of the arbitrator. Indeed, many professional

arbitrators employed on a regular basis in interstate commerce have become dependent on the will of the industry groups they serve for their tenure in office and the amount in payment of their salaries or compensation. *Cf.* The Declaration of Independence para. 11 (1776) ("[The king] has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries."). The federal arbitration system in particular is tilted very strongly in favor of high-volume "repeat customers."

A second major shortcoming of both federal and state arbitration proceedings relates to the lack of requirement that decisions be made according to a rule of law. Arbitrators are often told this as part of the industry training sessions. Initially, arbitration agreements were utilized by coequal parties who had entered into arms-length negotiations. Although that type of negotiation may have occurred between the appellant and respondents herein, it is not always the case. Now, notwithstanding the lack of negotiations concerning arbitration clauses, our legislature has provided that a court may vacate an award "[b]ut the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award." Minn.Stat. § 572.19, subd. 1(5) (2002). The Federal Arbitration Act specifies grounds for vacation of an award in 9 U.S.C. § 10 (2003), but that does not have the same statutory provision. However, federal case law has developed a very high standard in regard to the legal grounds for vacating an award that is similar to the Minnesota statutory framework. The federal courts will generally not vacate an arbitration award that is

---

1. For a detailed critique on the arbitration system, see Reynolds Holding, *Private Justice: Can Public Count on Fair Arbitration?*, S.F. Chron., Oct. 8, 2001, at A15.

based on an erroneous conclusion of law. *See Ainsworth v. Skurnick,* 960 F.2d 939, 940–41 (11th Cir.1992). Some circuits will not vacate an arbitration award absent a "manifest disregard of the law." *See, e.g., Kiernan v. Piper Jaffray Cos.,* 137 F.3d 588, 594 (8th Cir.1998).[2]

With the increasing use of arbitration we have to reevaluate whether or not the arbitrators should be bound to follow the law. We initially excused arbitrators from following the law because arbitrators may not necessarily be learned in the law, and they derive their powers from the parties and not from the law of the land. *See Park Constr. v. Ind. Sch. Dist. No. 32,* 209 Minn. 182, 186, 296 N.W. 475, 477 (1941). Now that the courts are officially advocating the use of arbitration and mediation in court cases, and more and more people seem to be involuntarily thrust into the ADR process, a provision that arbitrators follow the law to the best of their ability would be in order. With the help of jury instructions, we trust our juries to follow the law. We can and should expect no less from arbitrators who function as both judge and jury with the equivalent power of finality of a nonappealable judgment, which is set aside by the courts only in the rarest of occasions.

With these reservations in mind, I concur with the jurisdictional result reached by the majority in this case. However, the ADR system does need some immediate attention in an effort to improve the process as its use increases. If the arbitration process is going to continue to be a valid part of our system of justice, Congress and our legislatures have to be aware of significant shortcomings that have developed within the system. The long-term viability of the ADR process is fully dependent upon the trust and confidence of our citizens. In times of major government budget shortfalls on the federal and state level and in the interest of continuing to divert a large portion of our civil disputes into ADR process, we must work to professionalize the process, establish definite standards of ethical behavior and reincorporate the importance of the rule of law in the decision-making process.

Finally, I disagree with the majority's discussion relating to the four individual defendants and whether or not they are personally entitled to invoke arbitration provisions of the lease between Onvoy and SHAL. The majority is correct in asserting that arbitration clauses are generally contractual and cannot be enforced by persons who are not parties to the contract. To enforce the arbitration clause in our case, the majority cites several federal circuit court decisions relating to equitable estoppel, agency and third-party beneficiaries. In doing so, the majority constructs a line of reasoning that effectively nullifies the constitutional rights of citizens by restricting their access to our courts to adjudicate claims. This restriction is placed upon these citizens despite the fact that they

---

**2.** Recently, the Ninth Circuit moved away from the judicial trend to strengthen arbitration agreements. *Ting v. AT&T,* 319 F.3d 1126 (9th Cir.2003). In *Ting,* the court found unconscionable an AT&T arbitration clause that was included within a mass mailing. *Id.* at 1148–49. It held that a provision of AT&T's arbitration clause that banned class-action lawsuits violated California unconscionability law. *Id.* at 1150. AT&T's arbitration clause also violated state consumer protection law because it required consumers to pay arbitration costs in excess of those they would have to pay if they had brought their claims in court. *Id.* at 1151. Additionally, a provision that required proceedings to be confidential was found to unreasonably favor AT&T, as it provided an undue advantage towards future arbitrations. *Id.* at 1152.

never directly negotiated or signed into the arbitration requirement.

It is very common for individual principals to be called upon to personally guarantee agreements of companies in which they are involved. Similarly, personal arbitration provisions for principals, directors, officers and agents could also be included within the company's arbitration agreements. In drafting arbitration agreements between sophisticated parties, it would be quite simple to incorporate provisions requiring the individual principals involved with the entities also to agree to abide by arbitration. This type of issue should be subject to discussion and negotiation when arbitration agreements are being drafted.

Similarly, individual employees who may be agents of one or both companies should only be compelled to arbitrate by clearly negotiated agreements rather than court opinions. The court should therefore enforce specific terms of the arbitration agreement rather than effectively amending the agreement to include nonparties. By doing so, these issues will likely be addressed through private negotiation rather than judicial intervention. It will prevent courts from being forced to step into a dispute in order to decide complex factual and legal issues relating to equitable estoppel, agency and third-party beneficiaries.