In re PETTERS COMPANY,
INC., et al., Debtors.

(includes: Petters Group Worldwide,
LLC; PC Funding, LLC; Thousand
Lakes, LLC; SPF Funding, LLC; PL
Ltd., Inc.; Edge One LLC; MGC Fi-
nance, Inc.; PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.).

Douglas A. Kelley, in his capacity as the
court-appointed Chapter 11 Trustee of
Debtor Petters Company, Inc., PC
Funding, LLC, Thousand Lakes, LLC,
and PAC Funding, LLC, Plaintiff,

v.

Eide Bailly, LLP, Defendant.

Bankruptcy No. 08–45257.

Court File Nos. 08–45258 (GFK), 08–
45326 (GFK), 08–45327 (GFK), 08–
45328 (GFK), 08–45329 (GFK), 08–
45330 (GFK), 08–45331 (GFK), 08–
45371 (GFK), 08–45392 (GFK).

Adversary No. 12–4008.

United States Bankruptcy Court,
D. Minnesota.

Oct. 12, 2012.

350

Adam C. Ballinger, Daryle L. Uphoff, James A. Lodoen, James P. McCarthy, Mark D. Larsen, Lindquist & Vennum PLLP, Minneapolis, MN, for Plaintiff.

Peter A. Koller, Sarah E. Doerr, Thomas J. Shroyer, Moss & Barnett, Minneapolis, MN, for Defendant.

## ORDER REQUIRING ARBITRATION AND STAYING FURTHER PROCEEDINGS

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came before the Court on the motion of the Plaintiff ("the Trustee") for an order to compel the Defendant to participate in arbitration, and to stay further proceedings in this Court pending the completion of arbitration. The Trustee appeared by his attorneys, James A. Lodoen, James P. McCarthy, and Adam C. Ballinger. The Defendant ("Eide Bailly") appeared by its attorneys, Peter A. Koller and Thomas J. Shroyer. Connie A. Lahn appeared for the Committee of Unsecured Creditors in the underlying cases. The following order is based on the moving and responsive documents and the arguments of counsel.

## BACKGROUND AND CONTEXT

This adversary proceeding was sued out in a group of Chapter 11 cases that were commenced after the failure of the enterprise structure of Thomas J. Petters.[1] The plaintiff is the trustee who is administering the estates in the cases.

Technically, this lawsuit is not part of the Trustee's "clawback" effort, i.e., avoidance litigation commenced under bankruptcy law against investor-lenders, employees, and business associates who received substantial sums from the Petters entities during the active operation of the fraudulent scheme purveyed by Tom Petters and his associates.[2] Rather, the Trustee's main theory of suit against Eide Bailly is malpractice; he alleges that the Defendant failed to comply with professional duties, as to accounting and audit functions that Eide Bailly performed in 2008 under engagement agree-

1. Tom Petters was a Minnesota business promoter who had been very prominent in local and regional media since the mid–1990s. In 2009, he was convicted of multiple counts of fraud-based federal offenses. He is currently serving a 50–year prison sentence.

2. The fraud perpetrated by Tom Petters and his organization has been almost universally termed a "Ponzi scheme" since it came to light in the early autumn of 2008. The exis-

tence, extent, participant-population, and consequences of a Ponzi scheme have been very much at issue in the "clawback" litigation and related matters. *E.g., In re Polaroid Corp.,* 472 B.R. 22, 32–42 and 52–55 (Bankr. D.Minn.2012). For more description of the nature of "clawback" litigation, *see In re Petters Co., Inc.,* 440 B.R. 805, 806 (Bankr. D.Minn.2010).

ments.[3] Eide Bailly was engaged to do audits for debtors PC Funding, LLC and Thousand Lakes, LLC, and a "review" of PAC Funding, LLC.

The gravamen of this theory is that Eide Bailly failed to follow professional standards in evaluating the assets and financial statements for these entities; and that had it followed standards, the incidents of the fraud (a nearly complete absence of real, contracted transactions, hard inventory assets, and bona fide, collectible accounts receivable within Tom Petters's operation) would have come to light.

The signatory-clients under the written documentation were the three entities just named. All of them were so-called "special purpose entities" ("SPEs"), subsidiaries of Debtor Petters Company, Inc. ("PCI"). They had been formed as the vehicles for financing, cash-flow management, and debt repayment in connection with the business of "diverting" in which PCI was ostensibly engaged, i.e., the intermediation of bulk lots of consumer goods, facilitating their sale between wholesalers or retailers that held them as excess inventory and retailers that would want to acquire them for resale.[4]

The Trustee has sued Eide Bailly on behalf of the bankruptcy estates of those three SPEs (which are debtors in their own right under Chapter 11), plus the bankruptcy estate of PCI. Under common factual assertions, he has pleaded alternative theories of liability against Eide Bailly. They include malpractice and the failure to meet an auditor's professional responsibilities (Counts II and III of the complaint); aiding and abetting breaches of fiduciary duty by Tom Petters (Count IV); and breach of contract (Count V).

For its part, Eide Bailly denies any breach of duty or failure to comply with standards of care, as to the services it rendered for any of the debtor-entities. It categorically denies that it had any legal relationship with PCI under which it could be held liable to PCI in consequence of the engagements.

As affirmative defenses, Eide Bailly pleads unclean hands and *in pari delicto*. The gravamen of these affirmative defenses is that the Trustee, as successor-holder of these causes of action, is barred from recovery because Tom Petters and the business entities and persons in knowing cohort with him were the purveyors of a fraud that they actively concealed from Eide Bailly. As Eide Bailly would have it, its contracted clients were utterly complicit in the creation of any harm otherwise traceable to Eide Bailly's action or inaction, so the Trustee as successor-plaintiff is barred from recovery.[5]

---

3. The Trustee did plead seven other, separate counts for avoidance of transfers of funds to Eide Bailly that he characterizes as preferential, 11 U.S.C. § 547(b), or fraudulent, 11 U.S.C. §§ 547 and 548. The prayers for money judgments on these counts do not cite large numbers—$45,000.00 is sought under the fraudulent transfer theory and $13,000.00 under the preferential transfer theory—and neither theory of recovery is relevant to or properly subjected to the motion at bar. *See* pp. 11–14 *infra*.

4. "Diverting" is a bona fide process in the distribution sector of the consumer-goods re-

tail industry. *See In re Polaroid Corp.*, 472 B.R. at 36–37.

5. The Trustee admits that he sued this matter out in his status as administrator of the property of the bankruptcy estate under 11 U.S.C. § 541(a), i.e., on causes of action that the respective debtors held when their bankruptcy cases were commenced, on claims that they held against Eide Bailly then. *See In re Senior Cottages of America, LLC*, 482 F.3d 997, 1001 (8th Cir.2007); *In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d 1222, 1225 (8th Cir.1987).

Eide Bailly took the engagements under written letter-agreements. It used its own standard forms, which it required of Tom Petters for his business entities. There were three such agreements, each one signed by Deanna Coleman. (At that time, Coleman was one of the officers of PCI. Each letter-agreement identifies her as "VP Operations.") The statement "ACCEPTED BY [the particular SPE]" appears above her signature on each.[6]

Each one included a so-called "arbitration clause," worded as follows:

**DISPUTE RESOLUTION**

The following procedures shall be used to resolve any disagreement, controversy or claim that may arise out of any aspect of our services or relationship with you, including this engagement, for any reason ("Dispute"). Specifically, we agree to first mediate and, if unsuccessful, then arbitrate all Disputes between us, including without limitation any issue concerning the extent to which any Dispute is subject to arbitration, any Dispute concerning this agreement, the limitations of remedy provided by this agreement, or claims for breach of contract, negligence, fraud, fraud in the inducement, breach of fiduciary duty, violation of statute and any other cause of action or remedy.

. . .

**Waiver of Jury V. Arbitration Clauses**

*Choice of Venue and Waiver of Jury Trial*

We both agree *to* waive *our* legal right to a trial by jury for any Dispute, and to instead submit any unresolved Dispute to trial by a federal or state court venued in Fargo, North Dakota. We also both agree that the federal or state courts venued in Fargo, North Dakota shall have jurisdiction and exclusive jurisdiction over any Dispute.

*Arbitration*

If any Dispute has not been resolved within ninety (90) days after the written mediation notice, the mediation shall terminate and the Dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules of the Dispute Resolution Rules for Professional Accounting and Related Services Disputes of the American Arbitration Association, except where this agreement differs.

The arbitration will be conducted in Fargo, North Dakota before a panel of three (3) neutral arbitrators, two (2) of whom shall be practicing certified public accountants.

Any issue concerning the extent to which any Dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators.[7]

Through Count I of the Trustee's complaint, he seeks to have Eide Bailly com-

---

6. The dates on the agreements are, respectively, February 29, 2008 (Thousand Lakes); April 1, 2008 (PC Funding, LLC); and June 12, 2008 (PAC Funding, LLC). (A first line reading "Petters Group Worldwide," with the name of the particular SPE in the second line, appears at the very beginning of the first two letter-agreements. That first line is lacking from the third.)

7. The language quoted here is verbatim from the agreements for Thousand Lakes, LLC and PC Funding, LLC. The language from the agreement for PAC Funding is a little different in the ordering of some of its provisions, but it does not differ at all in substance.

pelled to submit to arbitration under the authority of these terms, and to have the litigation of this adversary proceeding stayed pending the completion of that arbitration. He filed this motion early in the litigation, demanding the benefit of the arbitration clause now as to all claims in suit.

Eide Bailly strenuously opposes the request, on a number of different legal arguments. Its attorneys make no bones about their client's motivation: they believe that an early assertion of the *in pari delicto* defense via a motion for dismissal or summary judgment would terminate the litigation in Eide Bailly's favor. They insist that such an outcome would be virtually mandated on the relevant pleadings and facts.[8]

The parties' arguments involve several layers of issues. All of them entail the body of law that regulates arbitration as a form of alternative dispute resolution. They arise solely from the text of the contractual clause in question, the posture of the various parties-in-suit as to the underlying engagement agreements, and the effect of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*, on that structure. No evidentiary development is necessary; this motion can be decided on the documentary record and the very thorough argument presented by counsel.

## JURISDICTION AND JUDICIAL AUTHORITY

The matter of jurisdiction—and more pointedly, judicial authority—is an issue in this adversary proceeding, and for the motion at bar.

For the threshold issue of jurisdiction, it can be said safely that all of the Trustee's pleaded causes of action are either core proceedings in the Debtors' bankruptcy cases, 28 U.S.C. § 157(b)(2), or proceedings related to those cases, 28 U.S.C. § 157(c)(1). Hence, the bankruptcy jurisdiction of the district court lies, 28 U.S.C. § 1334(a)-(b). The underlying cases and this adversary proceeding are before the undersigned pursuant to reference from the district court, 28 U.S.C. § 157(a) and Loc. R. Bankr. P. (D. Minn.) 1070–1.[9]

After that, it gets a little more involved. For the allocation of judicial authority to order judgment, the counts of the Trustee's complaint, as addressed by Eide Bailly's answer, are of three different types.

█ The seven counts for avoidance of transfers alleged to be preferential or fraudulent are core proceedings, via simple facial reference to 28 U.S.C. § 157(b)(2)(F)

---

8. In earlier submissions on this motion, Eide Bailly relied on just such an outcome, reached at the trial-court level in an action in the United States District Court for the Northern District of Illinois: *Peterson v. McGladrey & Pullen, LLP*, 2010 WL 4435543 (N.D.Ill.). Eide Bailly's counsel maintained that *Peterson v. McGladrey & Pullen* was materially indistinguishable in fact and legal substance from this adversary proceeding. (They also made much of the fact that the Illinois litigation was historically related to the matter at bar. It arose out of the bankruptcy filings of the Chicago-based Lancelot group of investment funds—which appear to have been the largest single lender to Tom Petters's organization that was "left in" and unsatisfied when his

scheme collapsed in September, 2008.) During the pendency of this motion, the Seventh Circuit reversed the trial court. *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594 (7th Cir.2012). That, however, did not change either side's strategy on this motion; the Trustee's demand for arbitration remains at bar, still contested, and thus it requires decision.

9. Put another way, but more metaphysically, it is before the bankruptcy court for this district—which, as a unit of the district court, is composed of the bankruptcy judges for this district, 28 U.S.C. § 151, even if it is not an "independent court" in a jurisdictional sense.

and (H). Those counts are germane to the motion at bar, but not as directly as the rest.

The parties are in tacit agreement on the status of all but one of the remaining counts; they classify the "substantive" counts of the Trustee's action for malpractice and breach of professional duty, i.e., II–V, as related proceedings.

■ They are correct in doing so. As causes of action for damages under non bankruptcy law that arose before the bankruptcy filings for any of the Debtors, these counts are indistinguishable for this purpose from the action for breach of contract in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The prepetition cause of action in *Marathon Pipe Line* is considered the prime example of one type of "related proceeding." *Celotex Corp. v. Edwards,* 514 U.S. 300, 307 n. 5, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995).

■ On the face of the pleadings, the disagreement lies as to Count I, the source for the motion at bar. The Trustee cate-

gorizes it as a core proceeding in his complaint. Eide Bailly expressly denies that. But, Eide Bailly does not deny that Count I is at least a related proceeding. This is prudent, given the integral relationship of Count I to the request for substantive relief in Counts II–V, with a common origin for all in the terms of a professional retention under contract. Count I is at least a related proceeding, and it will be treated as one for the disposition of the motion at bar.[10]

■ For Count I, as a related proceeding, the authority to make any final adjudication vests in a bankruptcy judge only with the consent of all parties. 28 U.S.C. § 1334(c)(2); Fed. R. Bankr.P. 7012(b). In its answer, Eide Bailly refused that consent, as to all counts that put related proceedings into suit. This raises an issue for the motion at bar: whether an order on it can be entered by a bankruptcy judge, or is to be made by a district judge after the presentation of proposed findings and conclusions pursuant to 28 U.S.C. § 1334(c)(1), Fed. R. Bankr.P. 9033(a), and Loc. R. Bankr. P. (D. Minn.) 9033–1.[11]

---

**10.** The Trustee's original thought may have been that his demand for arbitration on the malpractice causes of action was a "matter concerning the administration of the estate," and hence to be classified as a core proceeding under 28 U.S.C. § 157(b)(2)(A). But that theory is too attenuated to work in this circuit, given the caution voiced over two decades ago in *In re Cassidy Land and Cattle Co., Inc.,* 836 F.2d 1130, 1132 (8th Cir.1988). On the other hand, the outcome on the issue of arbitrability certainly "could conceivably have [an] effect on the estate being administered in bankruptcy," to use the touchstone language describing a related proceeding under bankruptcy jurisdiction. The use of arbitration in lieu of full-fledged submission to a court certainly would affect the length and expense of dispute resolution on the estates' claims. *See Celotex Corp. v. Edwards,* 514 U.S. at 308, 115 S.Ct. 1493; *and, e.g., Specialty Mills, Inc. v. Citizens State Bank,* 51 F.3d 770, 774 (8th Cir.1995) and *National City Bank v. Coopers*

*and Lybrand,* 802 F.2d 990, 994 (8th Cir.1986) (all using quoted formulation, first enunciated in *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)).

**11.** After the Trustee filed the motion at bar, Eide Bailly responded in part with a motion to have this adversary proceeding transferred to the district court immediately, pursuant to Loc. R. Bankr. P. (D. Minn.) 5011–3. The asserted bases for transfer were the nature of the claims in suit; Eide Bailly's demand for a jury trial; and its refusal to consent to a bankruptcy judge presiding over a jury trial or ordering a final judgment. That motion was heard immediately before the one at bar. It was denied. The authority was two-fold: the rationale previously framed in *In re Petters Co., Inc.,* 440 B.R. at 810–811, plus the general inter-court understandings that underlay the approval of the "Coordination Agreement" regarding the administration of all federal court cases in this district that involved

That issue is readily resolved by the nature of the specific relief that the Trustee requests via this motion, and its status as to finality under binding precedent from the Eighth Circuit Court of Appeals.

Were the Trustee's motion to be denied, it could not possibly be a final disposition of Count I. Hence, it would not be a final order appealable of right, in the context of bankruptcy jurisdiction. 28 U.S.C. § 158(a)(1) and (3) (appellate jurisdiction of district court lies as to "final judgments, orders, and decrees" entered in bankruptcy court, and *"with leave of the court,* from ... interlocutory orders and decrees ..." (emphasis added)); 158(b)(1) (same, as to jurisdiction of bankruptcy appellate panel); and 158(d)(1) (court of appeals has jurisdiction "from all final decisions, judgments, orders, and decrees entered" by district court or bankruptcy appellate panel). And were the Trustee's motion to be granted on its merits under governing nonbankruptcy law, the disposition is still not considered a final order appealable of right where the directive into arbitration is not coupled with a dismissal of the underlying court action for substantive relief. *ON Equity Sales Co. v. Pals,* 528 F.3d 564, 569–570 (8th Cir.2008) (citing *Green Tree Fin. Corp.–Ala. v. Randolph,* 531 U.S. 79, 86–89, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)).

Here, the Trustee has *not* requested dismissal. To the contrary, he moves for a stay of proceedings before this Court pending arbitration. Eide Bailly has not demanded dismissal, as alternate relief were arbitration ordered.[12] In any event, if arbitration is mandatory in accordance with the terms of the parties' agreement, the court is required to grant a stay of all arbitrable claims on motion of either party to the agreement. *AT&T Mobility LLC v. Concepcion,* —— U.S. ——, ——, 131 S.Ct. 1740, 1748, 179 L.Ed.2d 742 (2011) (citing 9 U.S.C. § 3).

So, dismissal as a potential disposition now is not even before the Court on motion of either party. It certainly is not appropriate to consider it *sua sponte.* Because neither outcome to the motion at bar generates a final order, a bankruptcy judge has the authority to enter an order on the Trustee's motion without need of a report and recommendation to a district judge.[13]

So, this motion is subject to the entry of an order on its merits to be issued by the bankruptcy court for this district, whatever the outcome.

---

Tom Petters and the failure of his asset structure, whether under criminal, civil, or bankruptcy jurisdiction [Dkt. Nos. 407 and 453, BKY 08–45257].

**12.** It is obvious why Eide Bailly has not made such a request as a condition for referral to arbitration. The reason is readily gleaned from its pleaded affirmative defenses; its notion of what an arbitrator would and would not entertain in dispositional procedures; and its insistence that it would be entitled to dismissal on the merits in formal court proceedings.

**13.** This conclusion is not as facile as it may seem. It is the only valid outcome, given the juxtaposition of bankruptcy law's structure for the division of labor on adjudication, with the Eighth Circuit's view on finality under the law governing arbitration. The Eighth Circuit's conception of finality circles back to the congressional intent to favor contractually-covenanted arbitration, manifested in part through the strict statutory limitations on appeals from orders mandating arbitration. *ON Equity Sales Co. v. Pals,* 528 F.3d at 567–568 (appellate jurisdiction is governed by § 16(b)(4) of Federal Arbitration Act, 9 U.S.C. § 16(b)(4), and not general provisions for appellate jurisdiction in Title 28, the Federal Judicial Code). *See also PRM Energy Systs., Inc. v. Primenergy, L.L.C.,* 592 F.3d 830, 833 n. 2 (8th Cir.2010).

## ANALYSIS

■ As a general matter, the Federal Arbitration Act reflects a strong federal policy that favors arbitration agreements and their enforcement. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). This frame of reference is tilted to favor the proponent of contractually-provided arbitration, which here is the Trustee. Thus, it is most logical to organize the treatment of the Trustee's motion by the several arguments that Eide Bailly raises in opposition.

At the outset, it is important to note again that four different parties-plaintiff demand arbitration and invoke the arbitration clause in Eide Bailly's engagement agreement. Eide Bailly premises two arguments on its substantive defenses to the Trustee's claims. These arguments are directed against all of the movant-plaintiffs and their joint demand for arbitration. Since their scope is broader, they should be addressed first. For this motion, however, the parties gave far more attention to the Trustee's bid for arbitration as to the PCI-derived claims, than to the demands by the other named plaintiff-estates. The bulk of the substance of Eide Bailly's argument is directed against PCI. Eide Bailly challenges the Trustee's standing to even participate in arbitration for the PCI estate, let alone to compel it. It does so on the ground that PCI was not a signatory to the engagement letters and (essentially) that PCI was not a client of Eide Bailly at all.

From the Trustee's perspective, ·PCI had the right to invoke the arbitration clause, despite its lack of signatory status; thus he may subject Eide Bailly to the arbitration of all of the claims he makes as PCI's successor. The Trustee presents several alternate theories to support this position. The treatment of these contentions logically follows the multi-plaintiff issues.

There is, however, a different cleaving line among parties and claims that should be addressed first of all: whether the Trustee's counts for avoidance of prepetition transfers pursuant to the Bankruptcy Code are subject to the arbitration clause of an engagement agreement that was entered before any signatory or putative client was put into bankruptcy. An outcome favorable to Eide Bailly on this question would split out those controversies from an arbitration process entirely, leaving the malpractice-based counts for separate analysis under the law of arbitration.

As it turns out, that is the appropriate tracking and the reason is straightforward. So, this inquiry will be addressed first. That will leave more weighty issues of arbitrability, going to the Trustee's malpractice claims, better-focused for analysis.

*I. Arbitrability of Fraudulent—and Preferential—Transfer Claims Under Counts VI–XII of Trustee's Complaint.*

■ The latter seven counts of the Trustee's complaint raise claims for avoidance of payments made by PCI to Eide Bailly on account of the services Eide Bailly rendered for the three debtor-SPEs.[14] The theories are all based on bankruptcy

**14.** Under the parties' pleadings, it is uncontroverted that the payments were made via the tender of four "checks from PCI to Eide Bailly" that "cleared PCI's ... bank account." Complaint [Dkt. No. 1], ¶¶ 76–77, p. 17; Answer and Counterclaim [Dkt. No. 6], ¶¶ 76–77, p. 15 (admitting ¶¶ 75–76 of the Trustee's complaint, with one qualification not relevant to the issues at bar). Thus, as to all these counts the Trustee seeks recovery from Eide Bailly "for the benefit of the estate of PCI." Complaint, ¶¶ F.–L. of prayer for relief, pp. 35–37.

law; the Trustee characterizes the transfers as preferential (11 U.S.C. § 547) or fraudulent (11 U.S.C. § 548). As a deep-fallback position, Eide Bailly argues that the Trustee's motion must be denied as to these counts, at a minimum.

This position is well-founded. The reason stems from the time the claims arose in relation to the time when the obligation to arbitrate was created.

The thrust of federal law gives favor to arbitration as a mechanism for dispute resolution; but it does not do so by direct statutory mandate in derogation of traditional legal remedies. Rather, the statute establishes a uniform structure to effectuate *contractual* consent to arbitrate:

A written provision in ... *a contract* evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*

9 U.S.C. § 2 (emphasis added).

When a debtor-entity (individual or artificial) goes into bankruptcy, an estate is created by operation of law, 11 U.S.C. § 541(a), and the estate becomes a separate legal entity. A separate fiduciary—a debtor-in-possession under Chapter 11, or a trustee—then is empowered, 11 U.S.C. §§ 1107(a), 1104(a), and 704(a). This fiduciary carries out two functions to fund the estate: the administration of the assets that passed into the estate from the debtor's ownership,[15] and the augmentation of the estate by recapturing transferred assets through exercise of statutory avoidance powers.[16] Before the creation of the estate and the empowerment of the fiduciary, the right to avoid transfers does not exist; hence, it cannot be in controversy before then. A right to recover transferred assets is entirely derivative of the bankruptcy process. A transferee may assert defenses to avoidance based on certain de facto aspects of its pre-bankruptcy relationship with the debtor.[17] But, though part of a controversy over avoidability is legally derivative of the original contractual undertaking of the debtor, or traceable to the debtor as a party to the contract, the issue of avoidability does not arise until the debtor is actually in bankruptcy.

Thus, there is no warrant under the law of contract or of bankruptcy to bind a trustee to a pre-petition arbitration clause, as to avoidance claims that are sued out under the trustee's powers under Chapter 5 of the Bankruptcy Code. *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith,*

---

**15.** 11 U.S.C. § 541(a) (property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case").

**16.** These powers are generally granted by the provisions of Chapter 5 of the Bankruptcy Code.

**17.** For instance, transfers originally "made in the ordinary course of business or financial affairs of the debtor and the transferee," or those "made according to ordinary business terms," are excepted from avoidance as pref-

erential, if the underlying debt was originally "incurred in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(A)-(B). It is also open to defend avoidance on the ground that the asset or value received was not even property of the debtor in the first instance. *E.g., In re Bruening,* 113 F.3d 838, 841 (8th Cir.1997); *Brown v. First Nat'l Bank of Little Rock,* 748 F.2d 490, 491 (8th Cir. 1984); *In re Graphics Tech., Inc.,* 306 B.R. 630 (8th Cir. BAP 2004), *aff'd,* 113 Fed.Appx. 734 (8th Cir.2004).

*Inc.*, 885 F.2d 1149, 1153 (3rd Cir.1989) (citing and quoting *Allegaert v. Perot*, 548 F.2d 432, 436 (2nd Cir.1977); holding that state law would not mandate arbitration by creditor bringing fraudulent conveyance action against transferee under state statute, despite prior agreement between debtor and transferee that contained arbitration clause; thus trustee invoking 11 U.S.C. § 544(b) to sue for avoidance of fraudulent conveyance is not legally bound to enter arbitration at defendant-transferee's demand). *See also In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181 (Bankr. S.D.N.Y.2002); *In re Interco Inc.*, 137 B.R. 993 (Bankr.E.D.Mo.1992). *Cf. Miller v. Dean Witter Reynolds, Inc.*, 134 B.R. 640, 641 (D.Minn.1991) (trustee's claims against defendant were related proceedings in bankruptcy, derived from debtor's position under pre-petition contract and law; hence trustee was bound by arbitration clause just as debtor had been pre-petition).

There is little extant case law that applies this rationale to litigation under the federal substantive law of §§ 547 and 548. However, that little extends the broad principle to these sorts of trustee claims. It makes the extension to support the integrity of the bankruptcy process and the central forum through which its remedies are to be administered. *In re Oakwood Homes*, 2005 WL 670310, *3–5 (Bankr. D.Del.2005) (applying rationale of *Hays* to deny defendant's demand to arbitrate avoidance claims under §§ 547 and 548; also observing that federal interest in consistent application of Bankruptcy Code's provisions on preferential and fraudulent transfers, within particular case and generally, supports carveout of such avoidance actions from arbitration on separate policy grounds).[18]

In light of the strength of *Hays's* main, structural analysis, it is not necessary to address the policy considerations found so compelling in *Oakwood Homes*.[19] The arbitration clause in Eide Bailly's engagement agreement simply cannot be applied to the Trustee's claims for transfer avoidance. Those claims are not derivative of any of the Debtor–Plaintiffs' rights and duties under the agreement or the engagement. Put another way, the bankruptcy estates themselves are not contractually vested with a right to demand arbitration, because the avoidance claims inured to the estates—entities legally distinct from the Debtors—months after the engagement was contracted. So, the Trustee cannot compel Eide Bailly to submit to arbitration on Counts VI–XII of his complaint.[20]

---

**18.** The Eighth Circuit has not addressed this issue, for either the variant situation presented by *Hays* or for the setup of the Trustee's claims at bar.

**19.** *But see MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2nd Cir.2006), and discussion in Larry E. Edmondson, *Domke on Commercial Arbitration*, § 52:6 (under "emerging rule" in case law, bankruptcy court generally lacks discretion to deny arbitration demand in related proceeding sued by trustee on debtor's pre-petition cause of action; in core proceeding like avoidance litigation, bankruptcy court may have discretion to deny demand for arbitration where congressionally-recognized policy goals of bankruptcy process—central forum, coordinated administration, and equal treatment of similarly-situated parties—override separate policy underlying Federal Arbitration Act). *See also In re Thorpe Insulation Co.*, 671 F.3d 1011, 1020–1021 (9th Cir.2012).

**20.** There is a small irony in this outcome, in that most or all of the cited decisions came out of a *trustee's resistance* to an arbitration demand made *by a defendant* in litigation commenced by that trustee. However, a principled analysis like the one in *Hays* must be applied in uniform fashion, without respect to the posture and identity of the party demanding arbitration.

*II. Readiness of Malpractice–Based Claims (Counts II–V of Trustee's Complaint) for Arbitration Given Responsive Pleading of Fraudulent Enducement and In Pari Delicto.*

As to the Trustee's malpractice-based claims, Eide Bailly argues that it is too early for arbitration.[21] Eide Bailly insists that two of its pleaded theories are powerful enough to defeat all of the malpractice claims on their merits, whether they are considered as defenses or as bases for counterclaim. Thus, as Eide Bailly would have it, arbitration should be deferred pending the litigation of those defenses and judicial decision on them.

These theories go directly to the broad, underlying cause of action. As a result, the arguments apply to all of the named plaintiff-estates, including PCI's.

### A. Fraudulent Inducement.

■ Eide Bailly pleads fraudulent inducement as the basis of a counterclaim for equitable relief to ratify its rescission of the engagement agreements and to hold them unenforceable.[22] The assertion is that Tom Petters and his enterprise structure acted under false pretenses and overt fraudulent representations to engage Eide Bailly for the performance of audit services on ostensibly bona fide business operations, when the subject entities were actually engaged in a massive investor-fraud scheme.

For the Trustee's motion, Eide Bailly focuses this notion more narrowly. Now the argument is that this defense, if proven, would require the voiding *of the arbitration clause.* Thus, it maintains, any action to enforce the arbitration clause should be stayed, and the Trustee's motion to compel arbitration must be denied, pending a resolution of the fraudulent-inducement issue.

The defense presentation here is not entirely candid. The issue of arbitrability in the face of a claim of fraudulent inducement involves two very different things. Yet the argument is brought forward, in unfocused fashion, even as Eide Bailly cites court decisions that recognize the distinction in the first place: *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) and *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006).

In *Prima Paint Corp.* and *Buckeye Check Cashing,* the Supreme Court was careful to distinguish between two different sorts of dispute over the invocation of fraudulent inducement in response to a demand for contractually-mandated arbitration. The first arises out of the substantive terms of a contract containing an arbitration clause, where the contract as a whole is alleged to have been fraudulently induced. The second is a dispute over whether an arbitration clause within a larger contract was itself (i.e., the clause) fraudulently induced. The distinction is important, because it goes to the breadth of issues to be subjected to arbitration pursuant to such a clause, versus those that should be presented preliminarily to a court before arbitrability on the merits is addressed.

In *Prima Paint Corp.,* the Court expressly held that the assertion of fraudulent inducement *in contract formation* was an issue properly left to arbitration with all other substantive issues going to *the*

---

**21.** This argument applies to Counts II–V in their entirety, regardless of which named bankruptcy estates are real parties in interest as parties-plaintiff.

**22.** Obviously, were Eide Bailly allowed to rescind the engagement, there would be no relationship-platform for the malpractice claims.

*whole contract;* while a court necessarily (and logically) must rule in the. first instance on a claim that *the inclusion of an arbitration clause* was fraudulently induced *in isolation,* before the clause (if enforceable) would be given effect by submitting the substantive issues to the arbitrator. 388 U.S. at 403–404, 87 S.Ct. 1801. *Buckeye Check Cashing* carries this understanding into the 21st Century, in somewhat broader terms. 546 U.S. at 446, 126 S.Ct. 1204 ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

Here, Eide Bailly's counterclaim for declaratory relief based on a fraudulent-inducement theory that goes to the engagement agreement as a whole, in a bid to undo the engagement in order to avoid malpractice liability entirely. *Answer and Counterclaim,* ¶¶ 27–36, at pps. 39–40.[23] As pleaded, the fraudulent-inducement argument is not directed toward excising the arbitration clause from an engagement agreement otherwise to be left standing and of legal consequence. Thus, under unequivocal precedent the counterclaim premised on the assertion of fraudulent inducement is to be presented for arbitration in conjunction with all other issues regarding the engagement and its underlying agreements. There is no cause to stay arbitration on this basis.

### B. *In Pari Delicto.*

■ In further support of a counterclaim for declaratory relief, Eide Bailly pleads the doctrine of *in pari delicto,* i.e., that the Trustee is barred from seeking a recovery on the estates' claims by wrongful conduct on the part of the four debtor-entities who were the predecessors-in-interest of the four plaintiff-estates. *See In re Senior Cottages of America, LLC,* 482

F.3d at 999 n. 3 (*in pari delicto* is an equitable and affirmative defense based upon common-law principle that plaintiff's recovery may be barred by his own wrongful conduct during events that gave rise to claim in suit). Eide Bailly believes that this theory is strong enough on the pleaded facts to become preemptive, i.e., that the Trustee (and the Debtors before him) could not even maintain suit on the allegations pleaded. Thus, Eide Bailly argues, *in pari delicto* should be presented to the Court for a ruling before the arbitrability of the malpractice-based counts is considered.

This argument is no more availing than the fraudulent-inducement theory, and for essentially the same reasons. The *in pari delicto* doctrine is a defense to the main claims in suit. *In re Senior Cottages of America, LLC,* 482 F.3d at 1004. Its relative strength or weakness has no bearing on its arbitrability. *AT & T Techs., Inc. v. Commc'ns Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious."). It is put into the mix in arbitration, with all of the pleaded substantive claims and defenses on their merits. *United Steel v. Carlisle Power Transmission Prods., Inc.,* 489 F.Supp.2d 924, 930 (D.Minn.2007) (affirmative defenses of release and waiver had to be determined in arbitration); *In re Le–Nature's, Inc.,* 2012 WL 363981, at *5 (W.D.Pa.2012) (discussing with approval, arbitration panel's decision that defendant's proven *in pari delicto* defense barred plaintiff's tort claims). There is no warrant to shunt this theory into a preliminary submission to the court either. The Trustee's demand for arbitration cannot be denied on this ground.

---

**23.** Through counsel's representation, at least, Eide Bailly would be willing to refund all sums paid by PCI on its invoices, as the necessary consequence of a rescission.

III. *Trustee's Right to Compel Arbitration of Malpractice–Based Claims (Counts II–V) on Behalf of PCI's Bankruptcy Estate.*

The balance of Eide Bailly's resistance goes to the Trustee's demand for arbitration on behalf of PCI's bankruptcy estate, as to the malpractice claims. Eide Bailly categorically denies that PCI would have had such a right under the engagement letter, because PCI was not a named client for Eide Bailly's service provisions; PCI was not a signatory to the engagement letter; and the arbitration clause did not identify PCI as a party that could demand or participate in the arbitration of any claim arising out of the engagement.

■■■ For proceedings under the Federal Arbitration Act, state law governs the ability of non-signatories to enforce arbitration provisions. *PRM Energy Systs., Inc. v. Primenergy, L.L.C.,* 592 F.3d at 833. In Minnesota, the general rule is that "arbitration clauses are contractual and cannot be enforced by persons who are not parties to the contract." *Onvoy, Inc. v. SHAL, LLC,* 669 N.W.2d 344, 356 (Minn.2003). However, the Minnesota Supreme Court and the Eighth Circuit both recognize "exceptions to the rule ... [framed under] at least three principles on which a nonsignatory to a contract can compel arbitration: equitable estoppel, agency, and third-party beneficiary." *Id.* (citing *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir.1999)); *CD Partners, LLC v. Grizzle,* 424 F.3d 795, 798 (8th Cir.2005) (relying on *MS Dealer Serv. Corp.*). The Trustee argues all three of these theories, in response to Eide Bailly's assertion of the general bar.

### A. Equitable Estoppel/Alternative Estoppel.

#### 1. Application on Its Merits.

The first exception to the bar on nonsignatories' enforcement of arbitration clauses has been variously termed "equitable estoppel," *ev3 Inc. v. Collins,* 2009 WL 2432348 (Minn.Ct.App. August 11, 2009), and "alternative estoppel," *PRM Energy Systs., Inc. v. Primenergy, L.L.C.,* 592 F.3d at 834–835 (citing *CD Partners,* 424 F.3d at 798–799). (For greater precision, the nomenclature "alternative estoppel" will be used.)

■■■ Under the local iterations from federal and state courts, alternative estoppel obligates a signatory-party to maintain a consistent substantive stance with respect to the underlying contract, the boundaries of its enforcement, and the status of signatories and non-signatories. In two different situations, it allows a non-signatory to compel a signatory to arbitrate on the claims the non-signatory has made under the contract.

■■■ The first is where the signatory resistant to arbitration asserts claims against the non-signatory that are premised on the terms and the enforceability of the contract, or that make reference to or presume the existence of the contract. *ev3 Inc. v. Collins,* 2009 WL 2432348, at *3. *See also PRM Energy Systs., Inc. v. Primenergy, L.L.C.,* 592 F.3d at 835 (alternative estoppel can bind signatory to arbitrate with non-signatory where signatory's claims again non-signatory are "so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement").

■■■ For the second, the local courts import the concept of "concerted misconduct" from the Eleventh Circuit's formulation in *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d at 947. When the signatory re-

sistant to arbitration with a non-signatory alleges for substantive purposes "substantially interdependent and concerted misconduct" by the non-signatory-opponent and one or more signatories, the signatory is estopped from denying that the arbitration clause is enforceable in favor of the non-signatory. *ev3 Inc. v. Collins,* 2009 WL 2432348, at *3. *See also PRM Energy Systs., Inc. v. Primenergy, L.L.C.,* 592 F.3d at 835 (where signatory has alleged "prearranged, collusive behavior" on part of non-signatory- and signatory-parties, and these claims are "intimately founded and intertwined with" contract at issue, alternative estoppel binds signatory to arbitrate with non-signatory on claims founded on contract).

The first premise does not avail the Trustee on behalf of PCI. The Trustee argues that the PCI-derived malpractice claims again Eide Bailly and his asserted right to arbitration rely heavily on the engagement agreement and the de facto way in which Eide Bailly and the four Debtor-entities performed under it. That is true enough, as an internal summary of his substantive position. However, the Trustee has the wrong party attached to the notion of reliance that would trigger estoppel. For the first premise, the equitable foundations for estoppel focus on the unfairness otherwise resulting, where a *signatory* would take advantage of the substance of a contract to support its claims in lawsuit, but would disavow the arbitration clause within that very contract. As such, the case law focuses on the basis for the *signatory's* claims, i.e., whether the signatory seeks affirmative or defensive relief in the litigation that would stem from the contract's substantive terms and would assume their legal vitality. *ev3 Inc. v. Collins,* 2009 WL 2432348, at *3.

 Eide Bailly is just not doing that, here. Yes, its counterclaim goes to the engagement agreement, as its subject matter. However, it seeks to have the contract nullified via rescission or a declaration of unenforceability. Most to the point, Edie Bailly does not seek affirmative relief in enforcement of the engagement's terms against its signatory- and non-signatory-opponents; entirely to the contrary. There is nothing inconsistent between Eide Bailly's fundamental position on the contract of engagement itself, and its repudiation of the arbitration clause that the contract contains. There is no basis on the first premise, the "reliance" theory, on which to alternatively estop Eide Bailly.

 The other premise for alternative estoppel is the assertion by the resistant signatory of "interdependent and concerted misconduct" on the part of the referent signatory- and nonsignatory-parties, in support of substantive positions in the litigation. In its submissions, Eide Bailly minimized the applicability of this premise for alternative estoppel. However, the Trustee is well-put in arguing it. The predicate triggering position is a prominent basis of Eide Bailly's broader theory, for its counterclaim for rescission and for its resistance to this motion alike.

In application, the "interdependent and concerted misconduct" premise is triggered where an opponent of arbitration demanded by a non-signatory tries to get substantive benefit from an accusation of active and wrongful past interconnection among signatories and non-signatories to the contract in question, but still would deny the benefit of an incorporated arbitration clause to a non-signatory-opponent. The underlying notion of equity, of course, is that a party should not be allowed to have it two ways at once, to its best substantive advantage, but toward a legal outcome based on a significantly unfair contradiction in logic.

To characterize the Trustee's causes of action as deficient in their origin, Eide Bailly points to the massive scope of the Petters Ponzi scheme. As the basis for its counterclaim, Eide Bailly dwells on the key role of the three SPE–Debtors in purveying the Ponzi scheme, as to their associated lender-investors. It also impugns the direct machinations of Deanna Coleman and James Wehmhoff, key employees of the Petters enterprise structure, as representatives and agents of those SPEs.

To be sure, these three entities were signatories, and the bankruptcy estate of non-signatory PCI is the target plaintiff for this part of Eide Bailly's argument against mandated arbitration. However, throughout Eide Bailly's briefing, it ratifies and then tries to exploit a fundamental position of *the Trustee's* litigation theory, that PCI was the hub of a multi-branched fraud in which none of the SPEs were functionally separate or distinguishable from PCI. In turn, Eide Bailly's counterclaims are partially premised on a theory of fraudulent collusion that permeated the structure and operation of the Petters enterprise, from which Eide Bailly now seeks to disconnect itself entirely.

At the very least, Eide Bailly at least condones the Trustee's theory that PCI and the SPEs were tantamount to one entity, for the defrauding of multiple third parties, as support for its own bid for substantive relief. This, undeniably, is an assertion of "interdependent and concerted misconduct" among signatories on the client-side of Eide Bailly's engagement and their non-signatory parent company, as a partial basis for rescinding the engagement. Under the second premise, fairness considerations alternatively estop Eide Bailly from denying that PCI had standing to obtain arbitration under the clause in Eide Bailly's own form engagement letter.

### 2. Eide Bailly's Rejoinder: Unclean Hands.

Eide Bailly argues that the doctrine of unclean hands bars the Trustee from invoking alternative estoppel. This argument is based on its allegations that PCI hoodwinked Eide Bailly into the engagement as a coordinated part of the fraud that PCI was perpetrating on numerous third parties; and that the Trustee's inheritance of any malpractice cause of action from any of the Debtors came with this derivative impediment as much as it came with more basic flaws.[24]

The Trustee responds by arguing that alternative estoppel is a "contract-based" doctrine, hence legal in nature, and thus an equitable defense like undue hardship is not to be countenanced. In that, he is wrong. The concept of alternative estoppel did evolve in disputes over contractual mandates for arbitration; but that origin-point does not make it a "contract-based" principle that lies only at law. Like any theory of equity, alternative estoppel arose to override the strict application of law (here, the "private law" of contract as enforced by the courts), to avoid the exploitation of legal remedies that would lead to unconscionably unfair ends. This fundamental classification of the doctrine is why the Minnesota courts use the broader term for it, "*equitable* estoppel."

On the merits of the doctrine, however, Eide Bailly loses. In a still-cited discussion of undue hardship, the Minnesota Supreme Court observed:

> The [unclean hands doctrine] does not apply where the relief sought by the plaintiff and the equitable right claimed by the defendant belong to or grow out

**24.** *Cf. In re Schauer*, 835 F.2d 1222, 1225 (8th Cir.1987) (bankruptcy estate and trustee succeed to same rights that debtor had in assets pre-petition, and no more).

of two entirely separate and distinct matters or transactions. Defendant's right to relief must be connected with the subject-matter of the suit. His adverse equity must grow out of the very controversy before the court or out of such transactions as the record shows were part of its history, or where it is so connected with the cause in litigation as to be presented in the pleadings and proofs, with full opportunity afforded to the plaintiff to explain or refute the charges.

*Lindell v. Lindell,* 150 Minn. 295, 185 N.W. 929, 930 (1921). The Trustee argues that there is a fundamental disconnect between the general taint of "bad motive," *Johnson v. Freberg,* 178 Minn. 594, 228 N.W. 159, 160 (1929), as it was immured in the Petters Ponzi scheme purveyed through PCI, and the goal of enforcing the arbitration clause against Eide Bailly. In this, he is correct; this is the controlling circumstance that prevents Eide Bailly from invoking unclean hands to avoid the enforcement of a clause that it required as a condition of its engagement.

To be sure, Eide Bailly raises fraudulent inducement on the part of PCI in the basic contracting of the engagement, as a basis for its counterclaim. It also protests (in conclusory fashion) that it would not have "agreed to arbitration" had it known of the Ponzi scheme. Answer & Counterclaims pp. 39–40, ¶ 33. However, the courts distinguish between the invocation and judicial consideration of fraudulent inducement, and of undue hardship. Fraudulent inducement goes to the initial formation of the contract, because its predicate events precede the parties' manifestation of mutual assent. However, as asserted in this context, unclean hands does not; it only goes to the inclusion of the arbitration clause in a contract already agreed-upon for its substantive terms. *Wolff v. Westwood Mgmt., LLC,* 503 F.Supp.2d 274, 283–284 (D.D.C.2007); *Wolff v. Westwood Mgmt., LLC,* 558 F.3d 517, 521 (D.C.Cir. 2009). Eide Bailly has not alleged unclean hands on the part of any of the plaintiff-Debtors, as to the inclusion of the arbitration clause in the boilerplate of Eide Bailly's own engagement letter.[25] The factual bases for its unclean hands defense only go to its counterclaim, made in fundamental challenge to the underlying contractual relationship. There is no articulated nexus to the arbitration clause itself, or to the issue of its enforceability in isolation. As successor to PCI, the Trustee is not barred from asserting the right to arbitration by this theory.

### B. Agency Theory.

As an alternate basis to compel Eide Bailly to arbitrate with PCI's bankruptcy estate, the Trustee invokes the "close relationship" or "agency" theory, premised on the ties among the client-signatory SPEs and PCI.

 The Minnesota Supreme Court has relied on principles of agency to compel contractual arbitration at the demand of a non-signatory, where this would "prevent circumvention of arbitration agreements" and would "effectuate the intent of the signatory parties to protect individuals acting on behalf of the principal in furtherance of the agreement." *Onvoy, Inc. v. SHAL, LLC,* 669 N.W.2d at 356. Thus, where non-signatory employees of a signatory-party are drawn into litigation over a contract with an arbitration clause, they may compel arbitration on the claims sued

---

**25.** At p. 15 of Eide Bailly's responsive brief [Dkt. No. 11], it focuses most of all on the fact that PCI ultimately pleaded guilty to mail and wire fraud on criminal charges made on allegations of the general operation of the Ponzi scheme. This act, of course, was long after the relevant fact here.

against them where the signatory could compel litigation on the claims against it—because "to do otherwise would be to subvert the intent of the signatories." *Onvoy*, 669 N.W.2d at 356. In *PRM Energy*, the Eighth Circuit articulated an agency-based theory on essentially the same terms: ". . . a nonsignatory . . . [can] compel arbitration when, as a result of the nonsignatory's close relationship with a signatory, a failure to do so would eviscerate the arbitration agreement." 592 F.3d at 834 (citing *CD Partners*, 424 F.3d at 798–799).

■ The Trustee uses this theory to urge that PCI, as the principal in an agency relationship with its three SPE-subsidiaries, could have compelled Eide Bailly to arbitrate on PCI's own claims against Eide Bailly. Eide Bailly's only rejoinder is that the agency theory can only be invoked by a non-signatory *agent* of a signatory-*principal*—which is not the alignment presented here.[26] It relies on the wording of *Onvoy's* holding, which grants non-signatory *agents* standing to enforce arbitration clauses in order to protect them where they had been "acting on behalf of the principal [i.e., the parent] in furtherance of the agreement." 669 N.W.2d at 356.

Eide Bailly's reading of *Onvoy* is unwarrantedly pinched. Further, its invocation of *Onvoy's* use of the 1983 edition of the prominent treatise *Domke on Commercial Arbitration* is no longer tenable. *Onvoy* undoubtedly features that quotation from the treatise because its frame of reference fits the alignment of parties in that case. Notably, the current edition contains the observation:

> Under agency principles and the doctrine of respondeat superior, when an agent negotiates a contract containing an arbitration provision on behalf of the principal, the principal may be bound to arbitrate even if the principal did not sign the contract containing the arbitration provision. To bind a principal by its agent's acts, the plaintiff must demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship.

1 *Domke on Com. Arb.* § 13.2 (2003) (citing *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 198 (3d Cir. 2001)).

■ Yes, the analysis of agency in the arbitration context is usually used to bind a principal to a duty to arbitrate, and this recent observation is premised on that application. However, it is entirely fair, consistent, and reasonable to have the consequences of an agency relationship flow

---

26. Eide Bailly does not deny that PCI and the SPEs had an agency relationship, for the purposes of this litigation; the parties do not even recognize this as an issue. Under Minnesota law, "control" is a predominant factor for the existence of a principal-agent relationship. *See Urban v. American Legion Dept. of Minnesota*, 723 N.W.2d 1, 12–13 (Minn.2006) (analyzing degree of control by parent company over its subsidiary, to determine whether subsidiary was agent of principal). While the separate legal personality of parent and subsidiary is recognized in the agency analysis, *Urban*, 723 N.W.2d at 12, Minnesota and general law recognize that a subsidiary can be held to be the agent of its parent where it is empowered to make a contract on behalf of the parent, *id.* (citing Restatement (Second) of Agency § 1). To like effect, a parent may be held the agent of the subsidiary on similar proof (citing Restatement (Second) of Agency § 14M cmt. a). Eide Bailly does not make an issue of PCI's control over the SPEs. This is a point well left unchallenged, given the pervasive proof throughout the underlying cases that Tom Petters had unfettered dominion over the holding companies in which he was a sole shareholder (PCI and Petters Group Worldwide, LLC), and in turn over all of those parents' subsidiaries.

both ways for this application. There is no indication in extant Minnesota law that a non-signatory principal should be barred from asserting the right to arbitrate; and there is no conceivable policy reason for denying that. Since agency principles can bind both principal and agent to contractual duty to arbitrate, they should allow both agent and principal to assert the right to arbitration against an unwilling signatory-opponent as long as the underlying substantive claims implicate the agency relationship.

That is the case here. PCI's bankruptcy estate has the right to compel Eide Bailly to arbitrate its malpractice claims on this theory as well.

### C. Third–Party Beneficiary.

As a last alternate basis to compel arbitration on behalf of the PCI estate, the Trustee argues that PCI was a third-party beneficiary of the engagement agreements and hence had the benefit of the arbitration clause.

 As a general matter, a stranger to a contract does not have rights under the contract; "but an exception exists if a third party is an intended beneficiary." *Hickman v. SAFECO Ins. Co. of America*, 695 N.W.2d 365, 369 (Minn.2005). A two-part test is applied to determine whether a nominal stranger to a contract is an intended third-party beneficiary.

First, allowing the third-party to enforce a contractual provision against a signatory-party must be "appropriate to effectuate the intention of the parties." *Id.* (citing Restatement (Second) of Contracts § 302 (1979)). Then, the third party's enforcement must match to either the "duty owed" test or the "intent to benefit" test.

 The duty-owed test is met when "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary." *Id.* The intent-to-benefit test is met when "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Id.* In determining the parties' intent to benefit a third party "the contract is read in light of all the surrounding circumstances." *Hickman*, 695 N.W.2d at 370.

 The Trustee relies only on the intent-to-benefit test. As "surrounding circumstances" to evidence an intent to benefit PCI from the engagement, he cites:

1. Eide Bailly's final audit report on Thousand Lakes recites that the report was "intended solely for the benefit of the owners," i.e., PCI;

2. PCI retained Eide Bailly to perform auditing work;

3. PCI paid Eide Bailly on invoices for the engagement out of its own account; and

4. The SPEs themselves were created solely to benefit PCI.

However, resort to extrinsic evidence to vest a third party with beneficiary status under a contract is warranted only where the contract is ambiguous on its face, as to that point. *Hickman*, 695 N.W.2d at 369. Where there is no such ambiguity, the contract is construed and enforced on its face as a matter of law. *Id.* The Trustee's cited circumstances all go to events of performance that occurred after the engagement was contracted, or to structural aspects of the relationship between PCI and the SPEs that were not referenced in the engagement letter or given any materiality by the agreement's terms. More to the point, the Trustee has not cited any language in the engagement letter that bespeaks a mutual intent to directly benefit an unnamed (but identifiable) nominal stranger to the professional engagement described. *Cf. Hickman*, 695 N.W.2d at

370–371 (terms of forced-placement casualty insurance contract procured by mortgagee after owner-mortgagor failed to obtain coverage as required, which expressly provided for disbursement to "borrower" of claim proceeds in excess of value of mortgagee's interest, gave owner-mortgagor status of third-party beneficiary under policy even though mortgagee was sole named insured).

Without a memorialization of such mutual intent, there is no platform for an argument that Eide Bailly and its named clients contemplated the vesting of a status under the engagement in PCI, *ab initio.* Thus, a third-party beneficiary theory does not support the Trustee in demanding the benefit of the arbitration clause, as successor to PCI.

### IV. Conclusion and Outcome.

It is not disputed that the Trustee may compel Eide Bailly into arbitration on the malpractice claims he pleads on behalf of the bankruptcy estates of the three SPE-debtors. Under Minnesota law, the Trustee may also compel Eide Bailly into arbitration on the malpractice claims he pleads on behalf of PCI's bankruptcy estate—because Eide Bailly is alternatively estopped from denying the Trustee's right to do so and because the agency relationship between PCI and the SPEs binds all of them and Eide Bailly alike to a contractual structure of arbitration on all claims arising under the contract of engagement. Finally, given the way Eide Bailly pled its defenses of fraudulent inducement, *in pari delicto,* and undue hardship, none of them lie to invalidate the arbitration clause of the engagement agreement, standing alone. Rather, the first two theories must be submitted for arbitration as substantive defenses to the Trustee's main malpractice claims.

## ORDER

IT IS THEREFORE ORDERED:

1. The Plaintiff's motion is granted, to the extent of the following relief.

2. Defendant Eide Bailly, LLP shall submit to arbitration with the Plaintiff, as Trustee of the four bankruptcy estates identified in the Plaintiff's complaint, on all claims pleaded under Counts II–V of the Plaintiff's complaint, pursuant to the terms of the engagement agreements executed by Debtors PC Funding, LLC, Thousand Lakes, LLC, and PAC Funding, LLC.

3. In all other respects, all further proceedings on Counts II–XII of the Plaintiff's complaint are stayed, pending the completion of arbitration pursuant to Term 2.