DIETZEN, Justice
(dissenting).
Minnesota law, as expressed in the common law and codified in the Recording Act, *806 has long protected the rights of a bona fide purchaser of real property against an unrecorded right in the same property. Those rights were preserved and extended by the Legislature when it enacted Chapter 325N. Today the majority ignores and disregards those rights. Instead, the majority engages in reasoning best characterized as a fast skate across thin ice to conclude that in a foreclosure repurchase transaction, the rights of a seller of real property trump the rights of a bona fide purchaser. Such a determination is not only contrary to the express provisions of Minn.Stat. §§ 325N.17(f)(3) and 325N.18, subd. 3 (2014), it is also contrary to the common law. Further, the majority’s opinion casts doubt on the ability of a buyer to rely on record title for any transaction that occurs during a foreclosure redemption period. Consequently, I dissent.
The issue in this case is whether First Minnesota, which loaned $145,000 against the security of Graves’s house, has any right to recover its loan from Graves when it had no notice that Graves had exercised his statutory cancellation right — indeed, when it had no notice that any party had an interest in the property except Michael Wayman and his entities (collectively, “Wayman”).[1] The issue is not whether Wayman was a scoundrel who defrauded Amos Graves and his wife: the district court settled that question when it found that Wayman committed numerous violations of Minn.Stat. §§ 325N.10-.18 (2014), and granted an award of exemplary damages against Wayman, and in favor of Graves, in an amount more than $107,000.[2]
The question is purely one of law — does Graves’s cancellation of his conveyance to Wayman under Minn.Stat. § 325N.13 operate as a legal bar to First Minnesota’s bona fide purchaser defense under sections 325N.17(f)(3) and 325N.18, subdivision 3? To answer this question, I will first examine and interpret the text of Minn.Stat. §§ 325N.13, 325N.17(f)(3), and 325N.18, subd. 3, in the context of the Recording Act, Minn.Stat. § 507.34 (2014), and then address the arguments raised by the majority.
I.
In 2004 the Legislature enacted Minn. Stat. §§ 325N.10-.18. Act of May 28, 2004, ch. 263, §§ 10-18, 2004 Minn. Laws 953, 959-67. The statute regulates a “foreclosure reconveyance”[3] between a “foreclosed homeowner”[4] and a “foreclo *807 sure purchaser.”[5] A foreclosure recon-veyance must comply with a number of requirements, including that the reconveyance be in the form of a written contract, Minn.Stat. § 325N.11; that the contract contain the entire agreement of the parties and include a notice of cancellation, Minn. Stat. § 325N.12; and that the notice of cancellation state the foreclosed homeowner has the right to cancel the foreclosure reconveyance by mailing the notice to the foreclosed purchaser within the cancellation period, Minn.Stat. §§ 325N.13-.14.
No one disputes that Graves was a foreclosed homeowner, that Wayman was a foreclosure purchaser, that the transaction between Graves and Wayman was a foreclosure reconveyance, or that Wayman violated multiple provisions of sections 325N.10-.18. Instead, the dispute is about whether First Minnesota is protected as a bona fide purchaser, notwithstanding Graves’s cancellation of the foreclosure re-conveyance. Thus, wé must examine the statute’s cancellation provisions and its protections for bona fide purchasers.
Graves exercised the right of cancellation set out in Minn.Stat. § 325N.13, which provides that “[i]n addition to any other right of rescission, the foreclosed homeowner has the right to cancel any contract with a foreclosure purchaser” within a specified cancellation period. Minn.Stat. § 325N.13(a). Section 325N.13 goes on to provide that “ [cancellation occurs when the foreclosed homeowner delivers, by any means, written notice of cancellation.” Minn.Stat. § 325N.13(b). I agree with the majority and the lower courts that Graves satisfied the requirements for cancellation of the foreclosure reconveyance under section 325N.13.
But section 325N.13 is subject to two separate provisions that, notwithstanding a possible violation of that statute or other provisions of Minn.Stat. §§ 325N.10-.18, protect a bona fide purchaser’s rights. First, Minn.Stat. § 325N.18, subd. 3, which is part of the enforcement section of the statute, affords a foreclosed homeowner a private right of action except that “[n]o action under this section shall affect the rights in the foreclosed property held by a* good faith purchaser for value under sections 507.34, 508.48, 508A.48, or other applicable law.” Thus, section 325N.18, subdivision 3, provides that an action to enforce rights under Minn.Stat. §§ 325N.10-.17 is subject to the limitations of Minn.Stat. § 507.34, which is commonly known as the Recording Act.
The Recording Act has long defined the rights of a bona fide purchaser under Minnesota law. See, e.g., Minn. Gen. Stat. ch. 40, § 21, at 330-31 (1866) (enacting substantively identical predecessor to the Recording Act); Miller v. Hennen, 438 N.W.2d 366, 369 (Minn.1989). It provides that any unrecorded “conveyance of real estate” is “void as against any subsequent purchaser in good faith and for a valuable consideration of the same real estate, or any part thereof, whose conveyance is first duly recorded.” Minn.Stat. § 507.34. A “purchaser” under the Recording Act includes a mortgagee, and a “conveyance” broadly includes “every instrument in writing whereby any interest in real estate is created, aliened, mortgaged, or assigned or by which the title thereto may be affected in law or in equity.” Minn.Stat. § 507.01 *808 (2014). The purpose of the Recording Act is to “protect persons who buy real estate in reliance upon the record.” Miller, 438 N.W.2d at 369 (citing Strong v. Lynn, 38 Minn. 315, 317, 37 N.W. 448, 449 (1888)). As we have observed at least as long ago as 1880, these protections facilitate functioning real estate markets:
But if titles held under such sales are liable to be defeated by secret frauds, which the vigilance of a purchaser cannot guard against, they can hardly be regarded as salable titles. No prudent man could pay a fair price for a title liable to such imputation. Make it a rule that sales perfectly fair on their face, which, so far as appears, have been conducted according to law, and which have been confirmed by the court ordering them, may be at any time and by any body shown to be null, and the titles under them entirely defeated, by proof of a secret understanding between a trustee and a purchaser, and such sales, as a means of obtaining the value of the land sold, will be impracticable.
The uncertainty which such a rule would introduce into titles would be contrary to the general policy of the law on the subject of titles, to real estate. That policy is to give stability to titles, and to enable purchasers using proper caution to be secure in the titles they take. This is the purpose of the statute regulating the registering of deeds [i.e., the Recording Act],
White v. Iselin, 26 Minn. 487, 492-93, 5 N.W. 359, 363 (1880) (emphasis added).
For purposes of the Recording Act, we have defined a “subsequent purchaser in good faith,” which we have also referred to as a “bona fide purchaser,” as one who acquires property (1) in good faith; (2) for valuable consideration; and (3) without actual, constructive, or implied notice of others’ prior adverse claims at the time of conveyance. Anderson v. Graham Inv. Co., 263 N.W.2d 382, 384 (Minn.1978); Bergstrom v. Johnson, 111 Minn. 247, 250, 126 N.W. 899, 900 (1910).
The basic requirements of section 325N.18, subdivision 3, are satisfied in this case. Minnesota Statutes § 325N.18, subd. 3, states that “[n]o action under this section shall affect the rights in the foreclosed property held by a good faith purchaser for value under” the Recording Act. Graves brought his action in relevant part under section 325N.18,[6] so the factual predicate of the statute is satisfied. And for purposes of the Recording Act, it is evident that Graves’s cancellation notice meets the description of an “instrument in writing whereby any interest in real estate is created, aliened, mortgaged, or assigned or by which the title thereto may be affected in law or in equity,” Minn.Stat. § 507.01 (emphasis added) — that is, a conveyance. Because Graves’s cancellation notice was a “conveyance” under the Recording Act, and because it undisputedly was not recorded,[7] the Recording Act provides that it is “void as against any subsequent pur *809 chaser in good faith and for a valuable consideration of the same real estate,” Minn.Stat. § 507.34 — in this case, First Minnesota.
Second, Minn.Stat. § 325N.17(f)(3) provides specific protections for bona fide purchasers in certain situations. Section 325N.17(f)(3), a part of the prohibited practices section of the statute, forbids the foreclosure purchaser from engaging in various practices, including:
(f) do[ing] any of the following until the time during which the foreclosed homeowner may cancel the transaction has fully elapsed:
[[Image here]]
(3) transfer or encumber or purport to transfer or encumber any interest in the residence in foreclosure to any third party, provided no grant of any interest or encumbrance is defeated or affected as against a bona fide purchaser or encumbrance for value and without notice of a violation of sections 325N.10 to 325N.18, and knowledge on the part of any such person or entity that the property was “residential real property in foreclosure” does not constitute notice of a violation of sections 325N.10 to 325N.18. This section does not abrogate any duty of inquiry which exists as to rights or interests of persons in possession of the residential real property in foreclosure
[[Image here]]
(emphasis added). That is, section 325N.17(f)(3) comes into effect when a foreclosure purchaser “transferís] or encumber[s] or purport[s] to transfer or encumber any interest in the residence in foreclosure to any third party,” and provides that no such “grant of any interest or encumbrance is defeated or affected as against a bona fide purchaser” who lacks notice of a violation of sections 325N.10-.18. Id.
Like the general preservation of bona-fide-purchaser rights under Minn.Stat. § 325N.18, sübd. 3, the specific proviso in MinmStat. § 325N.17(f)(3) clearly applies to preserve the bona-fide-purchaser rights of a party such as First Minnesota in this case. The target of section 325N.17(f)(3) is the transfer or encumbrance of the foreclosed property that occurs during the cancellation period. Such a transaction is prohibited, subject to the rights of a bona fide purchaser. It is undisputed that a Wayman entity, REA, granted a mortgage to C&M (and that mortgage was recorded) during the cancellation period.[8] REA’s grant of a mortgage to C&M during the cancellation period was a violation of Minn. Stat. § 325N.17(f)(3), and the violation triggered the proviso that “no grant of any interest or encumbrance is defeated or affected as against a bona fide purchaser or encumbrance for value.” Id.
First Minnesota has established that a Wayman entity encumbered the foreclosed property during the cancellation period in violation of Minn.Stat. § 325N.17(f)(3). The relevant question is whether First Minnesota was a bona fide purchaser within the meaning of the statute.
II.
The majority contends that the bona fide purchaser provisions of section 325N.17(f)(3) are not applicable because First Minnesota did not take title during the cancellation period. The majority mis *810 reads the statute. The protections of section 325N.17(f)(3) apply only when two separate and distinct factors are present. First, a prohibited transaction must occur during the cancellation period. Minn.Stat. § 325N.17(f). As discussed above, REA granted a mortgage to C&M during the cancellation period in violation of the statute.[9] Second, the purchaser seeking protection must be “a bona fide purchaser ... for value and without notice of a violation of sections 325N.10 to 325N.18.” Minn. Stat. § 325N.17(f)(3). If both factors are present, then the purchaser is entitled to the protections of the statute, which specifies that “no grant of any interest or encumbrance is defeated or affected” against such a purchaser. Id. At this stage of the proceeding, we must assume that First Minnesota is a bona fide purchaser without notice. Because both triggering requirements are present in this case, the requirements of section 325N. 17(f)(3) are satisfied.
Not only does this interpretation of section 325N.17(f)(3) give effect to the plain meaning of the statute, it also makes sense from a policy standpoint. It would make little sense to provide protections for a bona fide purchaser who took the property during the cancellation period, and then have those protections not extend to a subsequent transferee.
But the majority’s interpretation suffers from an even more serious defect. The majority interprets the proviso in section 325N.17(f)(3) to apply only when a foreclosure purchaser engages in a prohibited practice and the foreclosed homeowner does not cancel the transaction during the cancellation period. Then and only then, on the majority’s account, is the bona-fide-purchaser proviso triggered. The majority’s interpretation is unreasonably narrow: the most natural reading of the text is that the proviso applies whether the foreclosed homeowner does or does not cancel. Indeed, nothing in the statutory text limits the bona-fide-purchaser proviso to a circumstance when the owner does not exercise his cancellation right, and the majority does not even try to identify a provision in the text that would do so. The majority’s interpretation adds words to the statute, limiting the rights of a bona fide purchaser, that the Legislature has not supplied. “[W]e will not read into a statute a provision that the legislature has omitted, either purposely or inadvertently.” Reiter v. Kiffmeyer, 721 N.W.2d 908, 911 (Minn.2006) (per curiam).
Moreover, the majority’s interpretation is far-fetched and contrary to common sense. Regardless of whether section 325N.17(f)(3) applies in this case, it must apply in some case. It is, after all, a legislative command that we construe every statute “to give effect to all its provisions.” Minn.Stat. § 645.16 (2014); see, e.g., Jackson v. Mortg. Elec. Registration *811 Sys., Inc., 770 N.W.2d 487, 496 (Minn. 2009). The majority suggests that the proviso applies to prevent a foreclosed homeowner from allowing the cancellation period to expire without cancellation, and then, because a prohibited transaction occurred, claim that its rights are superior to those -of a bona fide purchaser. Such a scenario is too fanciful to be taken seriously. But even if a foreclosed homeowner were to attempt to carry out such a farfetched plan, he would have no rights against the bona fide purchaser, even absent the proviso, because his transfer to the foreclosure purchaser would be valid and uncancelled, depriving him of any rights in the property. Accordingly, the bona-fide-purchaser proviso would be meaningless.
In sum, the majority’s proposed interpretation is unreasonable and far-fetched. Section 325N.17(f)(3) applies when the foreclosure purchaser engaged in a prohibited transaction during the cancellation period, regardless whether the foreclosure purchaser timely cancelled the transaction, and the bona fide purchaser acquired its interest in the property without notice of a violation of sections 325N.10-.18. Accordingly, I conclude that the protections of Minn.Stat. § 325N.17(f)(3) apply to First Minnesota.
III.
Next, the majority concludes that Graves’s cancellation deprives First Minnesota of its rights as a bona fide purchaser under the statute, because a cancellation has the effect of “annulling] or invalidating]” the quitclaim deed that Graves gave to Wayman, making it “a form of rescission” that represents “the unmaking or abrogation of a contract.” Supra at 799. In short, the majority concludes that the cancellation rendered Graves’s quitclaim deed “void,” and there (in the majority’s view) the matter ends. The majority ignores our case law and fails to take the next step in the legal analysis to determine whether a bona fide purchaser has rights against the unrecorded rights of a seller: the conclusion that a transaction is void marks the beginning, not the end, of the analysis in this case. In describing the rights of bona fide purchasers, we have long drawn a distinction between “void” transactions that are merely voidable and thosé that are void ab initio. Specifically, a bona fide purchaser is entitled to the protections of the Recording Act if he claims, title from a transaction that is voidable, but not one that is void ab initio.
A.
A transaction that is void ab initio is “of no legal effect” or “null,” whereas a voidable transaction is “valid until annulled” and “capable of being affirmed or rejected at the option of one of the parties.” Onvoy, Inc. v. SHAL, LLC, 669 N.W.2d 344, 353 n. 9 (Minn.2003) (citing Black’s Law Dictionary 1568 (7th ed.1999)); see also Spartz v. Rimnac, 296 Minn. 390, 394, 208 N.W.2d 764, 767 (1973) (explaining with regard to voidable, as opposed to void contracts, “that action is necessary in order to prevent the contract from producing the ordinary legal consequences of a contract” (quoting Restatement of Contracts § 13 cmt. e (1932))).
On the one hand, transactions which a party originally intends to be valid but later seeks to cancel for various reasons such as fraud, misrepresentation, or mistake, are voidable. See Dahlberg v. Young, 231 Minn. 60, 67, 42 N.W.2d 570, 575 (1950) (“A deed which is procured through fraud or undue influence is not void but only voidable.”); Schaps v. Leh-ner, 54 Minn. 208, 212, 55 N.W. 911, 912 (1893) (stating general rule that a contract entered into by an insane person is not *812 void, “but at most only voidable”); Cochran v. Stewart, 21 Minn. 435, 438 (1875) (explaining that a contract of sale for personal property induced by fraud is not void, but voidable at election of vendor, and election must be made before fraudulent vendee sells to a bona fide purchaser).
Likewise, transactions that are rendered void because they did not comply with an applicable statute are generally considered voidable at the option of the aggrieved party, rather than void ab initio. See Greer v. Kooiker, 312 Minn. 499, 504-05 & n. 2, 253 N.W.2d 133, 138 & n. 2 (1977) (explaining that statute of frauds, which states that certain contracts “shall be void,” actually renders them voidable (citing MinmStat. § 513.05 (2014))); In re Sprain’s Estate, 199 Minn. 511, 514-16, 272 N.W. 779, 781 (1937) (holding that sale of property by interested personal representative in probate proceeding in violation of statute stating any sale “made contrary to the provisions of this section shall be void,” was voidable rather than void ab initio); Willard v. Finnegan, 42 Minn. 476, 478-79, 44 N.W. 985-86 (1890) (holding that sale of property made contrary to statute providing that “if the mortgaged premises consist of separate and distinct farms or tracts, they shall be sold separately,” was voidable rather than void ab initio); White v. Iselin, 26 Minn. 487, 489, 493, 5 N.W. 359, 360, 364 (1880) (holding that sale of minor’s property by minor’s interested guardian, in violation of statute stating that any sale “made contrary to the provisions of this section shall be void,” was voidable rather than void ab initio).
A voidable transfer of title does not defeat a bona-fide-purchaser’s rights. See First Fiduciary Corp. v. Blanco, 276 N.W.2d 30, 33 (Minn.1979) (finding when transaction was merely voidable, not void ab initio, a bona fide purchaser was entitled to protection); In re Sprain’s Estate, 199 Minn. at 514-15, 272 N.W. at 781; White, 26 Minn. at 493, 5 N.W. at 364; see also Bausman v. Faue, 45 Minn. 412, 417, 48 N.W. 13, 16 (1891) (distinguishing “on the matter of estoppel between a deed that is void and one that is only voidable, holding that the latter may and the former may not be the basis of estoppel”).
On the other hand, transactions in which the deed is forged or lacks a required signature are void ab initio, or void from the beginning. See Dvorak v. Maring, 285 N.W.2d 675, 677 (Minn.1979) (“[Without the signatures of both spouses a conveyance of homestead property is not merely voidable but is void and the buyer acquires no rights whatsoever.”); Blanco, 276 N.W.2d at 33 (“Where a deed to a homestead is not executed by one of the spouses, the transfer is wholly void, not merely voidable, regardless of the equities of the matter.”); Bausman, 45 Minn, at 417, 48 N.W. at 15-16 (“[Wlhere a deed was stolen from the grantor ... or the grantee had altered the deed so as to make it void, a bona fide purchaser was in no better condition than his grantor.”). A deed that is void ab initio transfers no interest and cannot pass title even in favor of a bona fide purchaser. See White & St. Townsite Co. v. J. Neils Lumber Co., 100 Minn. 16, 22, 110 N.W. 371, 374 (1907) (because deed purporting to transfer title was “void, not simply voidable,” given that grantor “had no power” to convey because he never “acquired any title,” .it was “immaterial” whether a subsequent purchaser was bona fide); Bausman, 45 Minn, at 417-18, 48 N.W. at 15-16.
When Graves exercised the statutory right of cancellation pursuant to section 325N.13, he rendered the transaction between him and Wayman of no legal effect as between them. But if he had never cancelled, the transaction would have been valid and enforceable between Graves and *813 Wayman. A transaction that is “valid until annulled” and can be “affirmed or rejected at the option of one of the parties” is voidable,, rather than void ab initio. See Onvoy, 669 N.W.2d at 353 n. 9. Indeed, that is its defining characteristic. Accordingly, such a transaction carries with it the protections in favor of a bona fide purchaser set forth in the Recording Act, Minn. Stat. § 507.34 and the corresponding protections in sections 325N.17(f)(3) and 325N.18, subdivision 3.
B.
The majority attempts to blur these distinctions with the glib statement that “[njothing plus nothing still equals nothing.” But as we have seen, in the field of bona fide purchasers, there are degrees of “nothing”: an agreement that is void ab initio was, in a sense, always nothing, while an agreement that is merely voidable becomes nothing only at the option of a party. The latter type of transaction, we have long held, passes an interest that can be protected in favor of a bona fide purchaser even if a party later chooses to void it. Indeed, both the majority’s analysis of the meaning of the term “cancel,” and its analysis of cancellation as a form of rescission, support the conclusion that the transaction was voidable, rather than void ab initio.
First, the majority notes that “cancel” means “to annul or invalidate.” But as described above, our case law clearly states that a transaction that is “valid until annulled” is voidable, not void ab initio. The majority also points out that to “annul” means “to ... declare void or invalid.” But while the majority emphasizes the word “void” in the latter definition, the important word is actually “declare.” A cancellation declares a contract void; but a transaction that is void ab initio is alivays void, and neither the parties nor anyone else can ever have any rights under it, regardless of their declarations. “The practical distinction between a deed voidable and one wholly void is that the former may be ratified ... while a deed wholly void is incapable of ratification.” Law v. Butler, 44 Minn. 482, 485, 47 N.W. 53, 54 (1890); see also Logan v. Panuslca, 293 N.W.2d 359, 362 (Minn.1980) (as between “voidable” and “void” contracts, “only a voidable contract can be ratified or confirmed”); Dayton v. Nell, 43 Minn. 246, 248, 45 N.W. 231, 232 (1890) (“[AJcts absolutely void cannot be ratified, while those that are voidable merely may be.”).
Second, the analogy of Graves’s cancellation to a right of rescission also supports the proposition that the transaction between Graves and Wayman was voidable. Our cases make clear that a right of rescission is relevant only for voidable contracts, not those void ab initio. Thus, in Mlnazek v. Libera, we stated that a contract induced by fraud “is not ... as a rule, void, but only voidable at the election of the defrauded party,” and the defrauded party has the “election of two remedies,” namely rescission and damages. 83 Minn. 288, 291, 86 N.W. 100, 101 (1901); see also Hatch v. Kulick, 211 Minn. 309, 310, 1 N.W.2d 359, 360 (1941) (“A contract [induced by fraud] is voidable. The victim may affirm and, keeping what he has received, sue at law for what damage he has sustained by reason of the fraud. Or he may, in equity or by his own act, rescind the tainted contract....”); McQueen v. Burhans, 77 Minn. 382, 393, 80 N.W. 201, 205 (1899) (Mitchell, J., concurring) (discussing “the subject of the rescission of voidable contracts”).
Although the majority cites numerous cases that stand for the proposition that rescission thoroughly unmakes a contract betiveen the parties, none of those cases suggest that rescission deprives a potential bona fide purchaser of any rights it may *814 have acquired in a chain of title from one of the parties. In Abdallah, Inc. v. Martin, 242 Minn. 416, 65 N.W.2d 641 (1954), the question was whether a buyer’s actions in returning defective goods constituted a rescission. We held that it did not, because the return of defective goods could be consistent with an award of damages under the contract. In Brown v. Calif. & W. Land Co., 145 Minn. 432, 177 N.W. 774 (1920), the question was whether defendants’ offer of performance, made after plaintiffs had rescinded, was effective; we held that it was not, because after plaintiffs had rescinded, there was nothing to perform. In Chase Manhattan Bank, N.A. v. Clusiau Sales & Rental, Inc., 308 N.W.2d 490 (Minn.1981), the question was whether a party who had rescinded could nevertheless enforce a waiver of defense provision in the rescinded contract; we held that the whole contract was rescinded. In none of these cases was a third party’s rights even at issue.
In sum, the cases cited by the majority are singularly unhelpful to the issue at hand. No party disputes that Graves’s cancellation returned Graves and Wayman to their pre-existing rights with regard to each other. Rather, the question is whether the unrecorded cancellation deprives a bona fide purchaser of its rights. For the reasons described above, I conclude the Legislature clearly answered the question in the negative.[10]
C.
The majority also claims to find support for its theory that cancellation extinguishes a bona fide purchaser’s rights in the requirement at common law that a deed be delivered to be valid. It is true that our cases at common law have stated that “delivery of a deed is essential to a transfer of title,” Slawik v. Loseth, 207 Minn. 137, 139, 290 N.W. 228, 229 (1940), and that “delivery of a deed is complete only when the grantor has put it beyond his power to revoke or reclaim it.” Babbitt v. Bennett, 68 Minn. 260, 263, 71 N.W. 22, 22 (1897). We have also held, in a different situation, that an undelivered deed is void ab initio, not merely voidable. White & St. Townsite Co., 100 Minn, at 22, 110 N.W. at 374.
How the common-law delivery rule applies to a statutory right of cancellation such as the one in Minn.Stat. § 325N.13 is a potentially interesting question. Delivery is primarily a question of fact depending on the intent of the parties. Exsted v. Exsted, 202 Minn. 521, 525, 279 N.W. 554, 557 (1938) (“Whether or not there has been a delivery is a question of fact.”); Babbitt, 68 Minn, at 262-63, 71 N.W. at 22 (“Delivery is a question of fact, and is mainly and primarily one of the intention of the grantor.”). We have never addressed whether a party who has the intent to deliver a deed, but is prevented by operation of statute from doing so, has “delivered” the deed. I am aware of no authority holding that delivery of a deed was ineffective because the transaction was subject to a statutory right of cancellation.[11]
The question is academic with respect to the cancellation right set forth in section *815 325N.13, however, because the Legislature has clearly abrogated the common-law delivery rule insofar as it applies to transactions during the cancellation period. Spe-. cifícally, the common-law delivery rule is inconsistent with any conceivable reading of Minn.Stat. § 325N.17(f)(3). Section 325N.17(f)(3) is triggered by a foreclosure purchaser “transfer[ing] or encumbering] or purporting] to transfer or encumber any interest in the residence in foreclosure to any third party” before “the time during which the foreclosed homeowner may cancel the transaction has fully elapsed.” Application of the common-law delivery rule, to chapter 325N would render any transaction during the cancellation period completely ineffective, because so long as the cancellation period has not yet expired, the foreclosed homeowner has not yet put the deed “beyond his power to revoke or reclaim.” See Babbitt, 68 Minn, at 263, 71 N.W. at 22. But the obvious intent and effect of the proviso in section 3252N.17(f)(3) is to protect a bona fide purchaser without notice, notwithstanding that the bona fide purchaser’s title derives from a transaction that occurred when the foreclosed' homeowner had a statutory right to reclaim the deed. The protection for a bona fide purchaser’s rights that the Legislature explicitly provided for this situation is therefore flatly inconsistent with the common-law delivery rule.
IV.
Finally, the majority faults my approach because, under it, Graves “did everything he was required to do under MHOEPA, yet would still lose his home.” Supra at 803. Underlying the majority’s reasoning is the implicit assumption that if Graves had not become involved in the transaction with Wayman, or if Wayman had reacted lawfully to Graves’s cancellation, then Graves would have kept his home. As the majority seems to recognize, see supra Part II.B., the record demonstrates the falsity of this assumption. The district court found that Wells Fargo had already foreclosed on Graves’s home, and he was facing a deadline of September 13, 2007, to redeem, when Wayman approached him less than a month before the deadline. Graves had already attempted, unsuccessfully, to secure financing to redeem the property. Graves had “received various offers for his interest in the home, including one for $15,000.00,” but he rejected them because they would not have preserved his ability to stay in his home.
In short, there is no reason to believe that absent Wayman’s involvement, Graves would still be in his home. If Wayman had never come onto the scene, or had responded lawfully to Graves’s cancellation, Graves would still have lost his home, not as a “penalty or obligation” imposed by the cancellation, see Minn.Stat. § 325N.14(a), but as the result of the prior foreclosure by Wells Fargo and Graves’s own inability to redeem.
To be sure, Wayman defrauded and harmed Graves. The district court found that as a result of his dealings with Way-man, Graves lost the equity that he had in the home, and unnecessarily made rent payments to Wayman pursuant to Way-man’s fraudulent scheme. But the district court accounted for all these losses and awarded exemplary damages to Graves in the amount of one and one-half times his actual damages, providing a substantial remedy for his losses (an award that the majority allows to stand).
*816 V.
By enacting Minn.Stat. §§ 325N.10-.18, the Legislature provided protections for foreclosed homeowners such as Graves. But in protecting foreclosed homeowners, the Legislature did not intend to ovérrule more than a century of other protections in favor of bona fide purchasers. Instead, it explicitly incorporated those protections into the statute. Those protections allow real estate markets to work smoothly, providing assurances to purchasers that they have good title when they purchase property that has been involved in a foreclosure.[12] Here, the majority makes those protections meaningless. And because a foreclosure purchaser’s failure to provide a contract that complies with sections 325N.10 to 325N.15 extends the cancellation period until the last day that a foreclosed homeowner has a right to redeem, the majority’s opinion calls into question the title of a foreclosed property throughout the redemption period. The majority’s approach creates disincentives for reputable purchasers to make loans for properties in foreclosure, thereby making it harder for homeowners in foreclosure to sell their property.
For these reasons, I respectfully dissent.

. Or so we must assume. Although the court of appeals concluded that First Minnesota was not a bona fide purchaser, see Graves v. Wayman, 816 N.W.2d 655, 664-69 (Minn. App.2012), the majority holds that even a bona fide purchaser in First Minnesota’s position has no rights against a homeowner. Supra at 798, n. 3.

. Under the majority’s approach, Graves receives not only the $107,000 judgment against Wayman, but also the continuing right to possession of the foreclosed property worth $182,000, notwithstanding that Graves has never redeemed the property.

. A "foreclosure reconveyance” means a transaction involving:
(1) the transfer of title to real property by a foreclosed homeowner during a foreclosure proceeding ... that allows the acquirer to obtain title to the property by redeeming the property as a junior lienholder: and
(2) the subsequent conveyance, or promise of a subsequent conveyance, of an interest back to the foreclosed homeowner by the acquirer or a person acting in participation with the acquirer that allows the foreclosed homeowner to possess either the residence in foreclosure or other real property, which interest includes, but is not limited to, an interest in a contract for deed, purchase agreement, option to purchase, or lease.
Minn.Stat. § 325N.10, subd. 3.

.A "foreclosed homeowner” means "an owner of residential real property, including a condominium, that is the primary residence of the owner and whose mortgage on the real *807 property is or was in foreclosure.” Minn. Stat. § 325N.10, subd. 2.

. A "foreclosure purchaser” means "a person that has acted as the acquirer in a foreclosure reconveyance” as well as “a person that has acted in joint venture or joint enterprise with one or more acquirers in a foreclosure recon-veyance.” Minn.Stat. § 325N. 10, subd. 4.

. In his Amended Complaint, Graves requests the court to "rescind!] the transaction between Plaintiff and Defendants ... under the Truth in Lending Act, Minn.Stat. § 325N.13, Minn.Stat. § 8.31, or as equitable relief under the Minnesota Prevention of Consumer Fraud Act and common law fraud” (emphasis added). See Minn.Stat. § 325N.18, subd. 1 (providing remedies for "[a] violation of sections 325N.10 to 325N.17”).

. The majority suggests that by applying the Recording Act I would create a "novel recording requirement.” Supra at 801. As I have described in the main text, there is nothing novel about the Recording Act's requirements, or the right of a bona fide purchaser to rely upon record title.

. Because Wayman had never provided a contract that complied with sections 325N. 10 to 325N.15, the cancellation period extended until September 13, 2007, which was the last day that Graves had a right to redeem under the foreclosure of the Wells Fargo loan. See Minn.Stat. § 325N.13(a).

. The majority asserts, based on the district court’s finding that REA and C&M were alter egos of each other and of Way man, that the grant of the mortgage was not a grant of an interest to a “third party” as proscribed by section 325N. 17(f)(3). Supra at 803. This is flatly contradicted by the district court's conclusion, unchallenged by any party in this appeal, that one of many acts by Wayman that "violate Minn.Stat. § 325N. 17(f)” was that "REA executed a mortgage to C&M during the rescission period and recorded the same.” The damage caused by the majority’s position goes far beyond its disregard of the proceedings in this case. In striving to reach its desired outcome, the majority asserts that a violation of the plain language of Minn.Stat. § 325N. 17(f)(3) is not an actual violation if it is "nominal” and "conducted solely to further the scheme.” Not only was the grant of the mortgage to C&M in this case "conducted solely to further the scheme,” it was vital to the perpetuation of the scheme. Yet the majority ignores the language of the statute to hold that it was not a violation.

. The majority argues that the distinction between transactions that are void ab initio and those that are merely voidable is not relevant to this case because First Minnesota did not rely on it. But the interaction between a foreclosed homeowner’s rights and the rights of a bona fide purchaser is at the heart of this case, both on the majority’s account and on the dissent’s. And under our well-established case law-, we cannot assess the parties’ respective rights without inquiring whether Graves's sale to Wayman was void or merely voidable.

. The parties did not address this issue before this court, and the district court made no findings of fact regarding it — understandably, because the parties apparently did not believe *815 the delivery rule was relevant to the issues in this case and therefore have never mentioned it.

. The majority remands the case to the district court "to determine whether First Minnesota has an interest in the property based upon equitable principles,” apparently in an attempt to soften the blow of the inequitable treatment it visits upon First Minnesota. The majority does not suggest any basis upon which First Minnesota could be entitled to equitable relief, and therefore I suspect the prospect of relief on such grounds is illusory.